# CHARLES M. PETERS ᴇᴛ ᴀʟ. ADMINISTRATODS *vs.* THOMAS H. TILGHMAN ᴇᴛ ᴀʟ.

*Trespass   Quare   Clausum   Fregit—Evidence—Declarations— Measure of Damages for Cutting Timber—Instructions to · Jury in Trespass to Try Title—Object Not Located on Plat—Adverse Possession.*

When the question in an action of trespass is as to the proper location and direction of an old road called for in a deed as a boundary, the refusal of the trial Court to allow the surveyor who executed the warrant of re-survey to testify as to whether the old road was pointed out to him is a non-reversible error, when the persons who were present at the survey testify to the fact that the road was pointed out to the surveyor.

The guardian of infants claiming certain land is an interested party, and evidence of his declarations as to the location of a disputed boundary is not admissible.

In an action of trespass for cutting down and carrying away trees from plaintiff's land, the measure of damages is the value of the trees when severed, without any allowance to the defendant for the cost of cutting them.

When the question in issue is as to the true location of a certain old road, and consequently whether a certain parcel of land was included within the lines of plaintiff's title deeds, it is proper to grant an instruction which segregates the evidence relating to the location of that road.

In an action of trespass to try title to land, where plats are filed and the only question is whether the plaintiff had title to a · particular part of the land included in his deed, a prayer is apt to confuse and mislead a jury which instructs them that if they find that the place located on the plat as the place of the trespass is included within the limits of plaintiff's title deeds, and that· the defendant entered upon the same, then the verdict should be for the plaintiff, although the jury may

believe that the plaintiff is not entitled to some other part of the land included within the boundaries of his deed.

In an action where the principal question is as to the location of one of the boundaries called for in a deed executed more than one hundred years ago, the jury are entitled to consider evidence of the general understanding and reputation among the owners, neighbors and others, who have been tenants or employees on the lands as to which is the line between the plaintiff's and defendant's lands.

When a certain lot or object is not located on the plat returned by the surveyor in an action of trespass, the question as to the course and end of a boundary line running to that lot should not be submitted to the jury.

Repeated acts of cutting timber on land are not to be treated as constituting adverse possession of the land.

*Decided June 1st, 1909.*

Appeal from the Circuit Court for Worcester County (HOLLAND, J.).

*Defendant's 4th Prayer.*—If the jury find from the evidence that the parcel of land, laid down on the plat, made under the warrant of survey in this case, as the "Trespass," and lying between the Tull Road and the road leading from the Fairfield House to the 27th line of Mt. Vernon, near the sawdust heap, had been in the undisputed and peaceable possession of the defendants, Ellen A. Robins and William L. Robins, and those under whom they claim title for more than twenty years before the deed to Caroline M. Peters from Joseph Godfrey and before the bringing of this suit, and that said Ellen A. Robins and William L. Robins and those under whom they claim, claimed to be the owners of said parcel of land, and publicly and notoriously held exclusive possession thereof as such against all other persons, and exercised acts of user and ownership over the same, in selling and cutting timber therefrom, and by renting said land to tenants, then, notwithstanding the jury may find that the road leading from

said Fairfield House towards said sawdust heap laid down on said plat, is the road described in the deed from James B. Robins to Littleton Robins, their verdict must be for the defendants. (*Granted.*)

*Defendants' 5th Prayer.*—The defendants pray the Court to instruct the jury that in ascertaining which of the two roads, claimed by the plaintiffs and defendants respectively, is the road named in the deed of James B. Robins to Littleton Robins, under which the plaintiffs claim, they may consider what was the general understanding and reputation as to which is the line between the plaintiffs' and defendants' lands, among the owners, neighbors and others who have been tenants, or employees on the said respective lands. (*Granted.*)

*Defendants' 6th Prayer.*—If the jury believe from the evidence that the east line of the plaintiffs' lands, as described in the deed of James B. Robins to Littleton Robins running from Hosher's Dam to the road named in said deed as the main horse road ended at the north side of the Porter's Lodge Lot, or at or near the road lying parallel to said lot on the north, if they find there was a road there, now disused, and did not cross over said Porter's Lodge Lot, and extend to the south side thereof, then the location of the road made and claimed as the main horse road by the plaintiffs as the road mentioned in the deed from James B. Robins to Littleton Robins, is not the true location of the same, and their verdict must be for the defendants. (*Granted.*)

The plat referred to in the opinion of the Court is the following:

Letters and words in ☐ Red.　　　　.. — .. — .. — .. — Red.

The cause was argued before Boyd, C. J., Briscoe, Pearce, Schmucker, Burke, Thomas, Worthington and Henry, JJ.

*E. Stanley Toadvin* and *George M. Upshur,* for the appellants.

*John H. Handy* and *William F. Johnson,* for the appellees.

Pearce, J., delivered the opinion of the Court.

This is an action of trespass *quare clausum fregit* brought by Caroline P. Peters in her life against the appellees, and upon her death the appellants were made parties plaintiffs in her place. The plaintiffs' close is described in the declaration as "certain lands of the plaintiff, the said Caroline P. Peters, situated in Worcester County in the State of Maryland, which were conveyed to her by Joseph Godfrey by deed dated December 1st, 1883, recorded among the Land Records of Worcester County, in Liber I. T. M. No. 10, folio 87."

The defendants pleaded not guilty, and took defense on warrant, but that warrant was countermanded, and later a warrant of resurvey was granted to the plaintiffs, and a survey and plat was filed by the County Surveyor to whom the warrant was issued, a copy of which plat will be inserted by the reporter. Locations for the respective parties were made upon the plat, and an agreement of counsel was filed in the case, admitting for the purposes of that action only, (1), "that the location of the certificate and patent of Mount Vernon patented to James B. Robins, December 19th, 1793, is correctly located by actual survey and protraction on the plat; (2), that the 27th line of Mount Vernon is correctly located on the plat; (3), that Hoshers Branch called for in the deed from James B. Robins to Littleton Robins, dated February 15th, 1793, from its entrance into Swan Creek to the going over way and dam therein mentioned, are correctly located on the plat." This agreement, together with

the plat and the *plaintiffs'* certificate and list of title papers, and the deed of February 15th, 1793, from James B. Robins to Littleton Robins, mentioned in the agreement, were offered in evidene by the plaintiffs. That deed recites that John Purnell Robins, the father of Littleton and James B. Robins, was seized in fee tail of a tract of land in Worcester County, called Mount Vernon, containing 723 acres of land, which he could not devise, and which descended on James B. Robins as issue in tail, whereby he became entitled to the greater part of his father's estate; but that James desired to make a more equal distribution of his father's estate, and he therefore by that deed conveyed to his brother Littleton 400 acres, part of Mount Vernon, included within the following metes and bounds, viz: "Beginning at the mouth of a gut that leads out of a branch called Hoshers Branch, and falls into a creek called Robins, or Swan Creek, thence up and with the said gut to the said branch called Hoshers Branch, to a going over of the said branch by an old dam; thence with a line drawn southwest to the main horse road that leads out from the said James Robins dwelling house to Snow Hill, by the way of the cross roads or shop, and thence with the said road to the outlines of Mount Vernon, and thence with the said outlines northerly and easterly to a marked red oak, a corner tree of the said track standing at the head of the creek called Robins Creek or Swan Creek, thence binding on the said creek to the first beginning, containing 400 acres of land more or less, as also all that tract of land called Robins Addition, lying adjoining the lands that were devised to said Littleton by his father, called Ennis Addition. Canarnec, etc." The plaintiffs also offered in evidence all their other title papers mentioned in their list and certificate filed in the case.

It will be seen by reference to the agreement above mentioned and to the surveyor's plat, that the whole tract patented as Mount Vernon to James B. Robins is conceded for the purposes of this suit to be correctly located on said plat, the twenty-seventh line of Mount Vernon being particularly men-

tioned as correctly located. It will also be seen from said agreement and plat and the surveyor's certificate that the beginning point of the tract conveyed by James B. Robins to Littletion Robins is correctly located on the plat at red letter A, at the end of the seventeenth line of Mount Vernon, where Hoshers Branch enters Swan Creek, and that the course of this branch from red letter A to the going over way and dam, and the going over way and dam itself are correctly located on the plat, the way and the dam being designated by black letter A, and that the *course* of the southwest line from letter A, to the main horse road called for in the deed to Littleton Robins is correctly located on the plat, but the length of this southwest line is in dispute, the contention being as to the location of the main horse road. The plaintiffs contend that this southwest line strikes the main horse road at the letter U on the plat, while the defendants claim it does not strike the main horse road until it is continued to letter B on the plat. There is no dispute as to the location of James B. Robins' dwelling as designated on the plat. But the defendants claim that the main horse road runs from this dwelling in a straight line till it intersects the twenty-seventh line of Mount Vernon, at the letter C as shown by the black line on the plat; while the plaintiffs claim that the main horse road diverges from said black line at or near the letter Q designated on the plat, and runs thence north of said black line, and in a straight line until it intersects the twenty-seventh line of Mount Vernon at the letter H, as shown by the red line on the plat. Thus it appears that the land in dispute is the wedge shaped piece between the conflicting locations of the main horse road, marked Trespass on the plat, from which parcel the defendants, Tilghman and Purnell have cut the timber purchased by them from their co-defendants Ellen A. Robins and William L. Robins, who claim title under Littleton Robins' deed above mentioned.

The sole question therefore is the true location of the main horse road.

Both parties offered evidence in respect to the location of
this road, tending to prove the issues on their respective
parts, and the defendants filed in the case before the trial a
list of title papers and a certificate of the several lines run
and locations made for them by the surveyor, but did not
offer in evidence at the trial any title papers whatever.

Two exceptions to the rulings upon the evidence were taken
by the plaintiffs, and one to the ruling upon the prayers, and
the verdict and judgment being against them they have ap-
pealed.

During the examination of Mr. Schoolfield, the surveyor
who executed the warrant, and while he was testifying as to
the plaintiffs' location of the main horse road on the plat he
was asked by the plaintiffs' counsel to state what was the
condition of that road between the point where it crossed the
twenty-seventh line of Mount Vernon at the letter C on the
plat and the continuation of the course of the road to the
Seaside road at the point indicated by the letter F, the pur-
pose being to show that this main horse road as located by
the plaintiffs originally ran to the letter C. The witness re-
plied that this road was in existence up to Pennewells' field,
and within about 30 rods of the Seaside road, and that the
red part of the line between C and F, indicated the part of
the road now covered by Pennewells' cultivated field. He was
then asked: "Did any one point out that old road there as a
continuation of the road you have testified about?" and the
defendant objecting to the question the Court sustained the
objection. This is the first exception. It will be seen that in
the certificate which had been admitted in evidence, the sur-
veyor certified that he located "the main horse road *con-
tinued,* that leads from James B. Robins' dwelling to Snow
Hill, beginning at the letter C and running to the County
road and crossing the same into an old road towards Snow
Hill, the route of which was pointed out by William Guthrie,
Jesse W. Messick, John Tull and John E. Holstein." More-
over before the question excepted to had been put to him, he
had testified without objection that this road "was then in

existence up to Pennewells' field where it was cultivated, and in reply to a question how he knew there was a road there, he said "my recollection is that old road was pointed out there," and that "they pointed out a lot of cinders there where there had been a blacksmith shop." Besides this, George Smack who was on the survey, testified at the trial that there were signs of a straight road from the Robins' dwelling until it reached the Seaside road near Pennewells' house, and Charles H. Smack, also on the survey testified at the trial to the same exact effect. Jesse Messick, John Hickman and John E. Holstein, all of whom were on the survey also testified at the trial to the same effect. The last named testified that he had heard his father say that in Judge Robins' day there was a straight road from the Seaside road down to Fairfield (the James B. Robins' dwelling), and you could see a light when you left tht Seaside road at Judge Robins' house. It is therefore clear that the jury was in full possession from all the sources above mentioned, of all the information which could have been given it, if the witness had been permitted to answer the question, and the plaintiffs suffered no injury by the exclusion of the answer. There was no reversible error in this ruling.

During the examination of defendants' witnesses, one of them, Joshua Morris, testified that in 1872 he ran a sawmill for Collins and Vincent near this land and sawed timber which Collins and Vincent had purchased from the Robins and Peters' land at the place of the trespass claimed in this case. He was asked whether any lines between these tracts were pointed out to him, and if so by whom, and he said there had been by John R. Purnell, who was dead at the time of that trial. He was then asked what road Mr. Purnell pointed out as the line, and this question was objected to, but the Court overruled the objection and permitted the witness to answer. It appears from the evidence in the record that Mr. Purnell was then the guardian of Mrs. Robins' children and was in charge of the Fairfield tract belonging to them. He was therefore interested in the subject of the

boundary, and the declarations of a party interested in any manner, are not receivable in such cases. 1 *Greenleaf on Evidence,* sec. 145; *Jarrett's Lessee* vs. *West,* 1 H. & J. 501; *Martin* vs. *Gunby,* 2 H. & J. 248. There was error therefore in the admission of this evidence, and there is nothing in the record which would enable us to say that the plaintiffs were not injured thereby.

The third exception brings up the ruling on the prayers.

The Court granted the plaintiffs' first, second, third and sixth prayers, and refused their fourth and fifth prayers.

The first prayer instructed the jury that if they found from the evidence that the defendants broke and entered the lands of Caroline P. Peters, at the place located on the plat marked "Trespass," prior to the institution of the suit, and that Caroline P. Peters had died since the institution of the suit, and that letters of administration were granted to the plaintiffs on her personal estate by the Orphans' Court of Worcester County, and that Caroline P. Peters resided in Worcester at the time of her death, and that the defendants cut down and carried away timber trees and other trees from said land, then the plaintiffs were entitled to recover the value of such timber trees and other trees as the jury should find the defendants cut down and carried away.

The second prayer related to the measure of damages for cutting and carrying away timber trees and other trees, and asserted this measure of damages to be "such sum as the jury may find the said timber trees and other trees were worth when first severed from the land, without deducting the expense of severing the same from said land, and the jury is at liberty to allow such interest thereon as they may deem right and proper."

The third prayer instructed the jury that if it found the preliminary facts set out in the first prayer, and also found that the defendants trampled down and cut up the land at the place located on the plat and marked "Trespass," then the plaintiffs were entitled to recover such sum as would compensate for the injury occasioned thereby.

The appellees made no criticism of these prayers, and we discover no error in them. The rule of damages given in the second prayer is that given in *Barton Coal Co.* v. *Cox,* 39 Md. 1, for trespass *q. c. f.* and mining and carrying away coal, and approved in *Blaen Avon Coal Co.* v. *McCullough,* 59 Md. 403. The principle there applied was that where the article or thing taken away had not then been changed by the taker into some new form, as for instance, timber into boards, but was carried away in the form in which it first became a chattel, its value in that form represents the owner's loss, and that as its taking was wrongful, the wrongdoer can be allowed no deduction on account of his labor bestowed in converting it into a chattel. The rule is properly applicable in the present case.

The sixth prayer instructed the jury that as the defendants had in evidence no title paper, or color of title to the place of trespass designated on the plat, then if the jury found that the place of trespass was within the lines of the deed from Godfrey to Caroline Peters under which she claimed, then the verdict must be for the plaintiffs, unless the jury found that the defendants had held the lands located as the trespass by adverse, undisputed, exclusive, and unmixed possession for at least twenty years before suit brought.

This prayer was properly granted, and as the fifth prayer was fully covered by the sixth, the fifth was properly refused.

The fourth prayer, which was rejected, asked an instruction, that "if the jury finds that the place located on the plat as the place of trespass is included in the limits of the deed of Littleton Robins from James B. Robins dated February 15th, 1793, came into the ownership and possession of Caroline P. Peters by mesne conveyances and descent, as produced in evidence by the plaintiffs, and the defendants broke and entered upon the lands of the plaintiffs, as located on the plat, then their verdict must be for the plaintiffs, even though the jury may believe that the plaintiffs are not entitled to some other part or parts of the land included in the boundaries of said deed."

To maintain this prayer the plaintiffs rely upon the case of *Tyson* v. *Shuey*, 5 Md. 540, in which the Court held that where the *narr.* charged a trespass as having been committed on the plaintiff's close called Greyhound Forest, it does not necessarily assert title to, or claim possession of, the entire tract, and therefore proving possession of part thereof, and a tresspass on such part is all that is required. But that was said in a case which was tried without plats or locations, and we do not think what was there said applies to this case. Here the trespass was accurately located as beginning at C, thence running to H, thence by the Tull road thirteen courses to the letter Y, and thence to the beginning C. The Porters Lodge Lot does lie between the two disputed locations of the main horse road, and adjoins the trespass as located, but does not lie, even in part, within the trespass as located. The defendants did offer some evidence tending to show title by actual enclosure to Porters Lodge Lot or a part thereof. But no question of title or possession of Porters Lodge Lot could arise in action of trespass *q. c. f.* confined to another part of the land between the disputed roads, but no part of the place of tresspass, and the granting of that prayer would have confused and misled the jury and permitted them to consider an issue not involved in that suit.

There can be no objection to defendants' second prayer, which is really their first, as it merely requires the plaintiffs to establish their claim by preponderance of proof. The plaintiffs' objection to the defendants' third prayer is that it segregates a part of the evidence, and asks a verdict upon that alone. But we do not think the objection is tenable in this case. The prayer asserts that if the Tull road as laid down on the plat is the road intended by the deed from James B. Robins to Littleton Robins under which the plaintiffs claim. then the plaintiffs cannot recover. Now it will be seen from the plat that the Tull road is the northerly line of the trespass as there located, and if the Tull road is also the Main Horse Road mentioned in the deed from James B. Robins to Littleton Robins, then it is also the southerly boundary of the

plaintiffs at the alleged place of tresspass, and no other fact or facts in the case could under the locations and pleadings establish any trespass by the defendants upon the plaintiffs. Segregation in such case constitutes no error.

Defendants' fifth prayer permitted the jury to consider evidence of the "general understanding and reputation among the owners, neighbors and others who have been tenants or employees on the said respective lands as to which is the line between the plaintiffs' and defendants' lands," and we think there was no error in the legal proposition asserted. Such evidence was allowed in *Redding* v. *McCubbin,* 1 H. & McH. 368, and in *Howell* v. *Tilden,* 1 H. & Mc.H. 84. It was not admitted in *Medley* v. *Williams,* 7 G. & J. 67, though the Court said it should be received "where more certain and positive evidence is not likely to exist." In *Tyson* v. *Shuey, supra,* it was objected that the lines, boundaries, and location of Greyhound Forest could not be established by general reputation, but the Court overruled the objection, saying that the decisions cited to sustain the objection were prior to the Act of 1852, Ch. 177 (now sec. 15 of Art. 75), providing that lands may be described in declarations of ejectment or trespass by any name acquired by reputation, and the Court added: "If a party may declare upon the name which the land has acquired by *reputation,* by what possible means, or by what species of evidence can he sustain the allegation except by resorting to proof of that very *reputation* which established the name?" The weight of authority in this country, both in the State and Federal Courts, is strong to the same effect. 5 *Cyc.,* 957-958; *Boardman* v. *Reed,* 6 Peters, 328; *Clement* v. *Packer,* 125 U. S. 321; *Ayres* v. *Watson,* 137 U. S. 596. And the reasons given in *Tyson* v. *Shuey* and elsewhere for the rule are sound and satisfactory.

We think defendants' sixth prayer ought not to have been granted. Its theory is that if the east line of plaintiffs' land, being the southwest line from A to the main horse road, ended at the north side of the Porters Lodge Lot, and did not cross over and extend to the south side thereof, then the loca-

tion of the main horse road made by the plaintiffs is not the
true location of that road. But the vice of that prayer is that
Porters Lodge Lot is nowhere located on the plat, and there is
nowhere in the record any evidence of its outlines or dimen-
sions. The evident purpose of the prayer is that if the jury
find this southwest line stops at U on the plat and does not
extend to B, then the plaintiffs' location of the main horse
road is not the true location. But this is merely saying if the
southwest line only runs to the defendants' location of the
main road, then the plaintiffs' location cannot be the correct
one. That proposition might be tenable, if this southwest line
called for a distance marked by a well-defined and well-estab-
lished visible object, such as a marked stone, or notable tree,
and if that distance when it reached that object, should locate
the object upon the line of the main road *as located by the de-*
*fendant;* but that southwest line has no given distance, and its
only call is for the main horse road, the location of which
is the very thing here in controversy, and the reasoning of the
prayer goes in a circle. Moreover the reference to the Porters
Lodge Lot as a terminus of the southwest line is a sufficient
reason for refusing the prayer, since that lot is nowhere locat-
ed, and it is impossible for the jury to know or even to con-
jecture where its north or south line is to be found.

There was error also in granting the defendants' fourth
prayer. There was no paper title or color of title shown by
the defendants in the place of trespass, but the plaintiffs did
produce an unbroken paper title to the place of trespass if it
lies within the lines of Godfrey's deed to Mrs. Peters. Hence
the possession of the place of trespass by the defendants or
their predecessors in title must have originated in tort, and
this prayer permits tortfeasors to tack their wrongful posses-
sions so as to constitute adverse possession, and it is settled
that this cannot be done.

This prayer also permits the jury to find adversary posses-
sion of the place of trespass by the defendants from "acts of
user and ownership over the same in selling and cutting tim-
ber therefrom." But this is not evidence of adversary posses-

sion. *Waterman on Trespass,* Vol. 2, page 9, 1st Edition, note on cutting timber; *Gent* v. *Lynch,* 23 Md. 65. In that case JUDGE BARTOL said, cutting and selling wood from time to time "are mere successive acts of trespass, nothing more." And so in *Parker* v. *Wallis,* 60 Md. 19, where the acts relied on were to dig and sell sand from time to time, the Court said: "The entries thereon for that purpose were but successive acts of trespass against the true owner, if he was not owner himself."

We shall request the Reporter to set out the defendants' fourth and sixth prayers in full, that their discussion may be more readily understood.

For the errors indicated the judgment must be reversed.

> *Judgment reversed, with costs to the appellants above and below, and new trial awarded.*