## MT. SAVAGE GEORGE'S CREEK COAL COMPANY,
### ET AL.

*vs.*

## ANDREW MONAHAN ET AL.

*Coal lands: trespassers; removal of coal; damages; chapter 287 of Acts of 1894; exemplary damages. Equity: questions of fact; authority of court to pass on.*

A bill in equity was filed against a coal company to enjoin it from trespassing upon the plaintiffs' lands and from mining and carrying away their coal, etc.; there were prayers to require the defendants to disclose how much of said coal the defendants had taken, when and to whom it was sold, and to account for that taken, as well as for damages to the plaintiffs' remaining coal.                                          p. 655

The defendants, by an amended answer, admitted that they had taken and sold 3,250 tons of coal, and stated that the company was ready to compensate the plaintiff for it; they denied that it was taken fraudulently, negligently or willfully, but alleged that it was taken by accident, without fraud and without negligence, and with the belief that it belonged to the defendant company.                                          p. 656

It was agreed that the court could pass upon the issues as if it were a trial at law and the court sitting as a jury.   p. 657

On appeal for a decree ordering such an accounting, it was *held*:

*First*—That the court was right in holding the defendants guilty of negligence and, it being in equity, the court was authorized to pass on that question of fact.                  p. 659

*Second*—That prior to the Act of 1894, chapter 287, section 92 of Article 75 of the Code, the rule for damages for tres-

Md.]                              Syllabus.

passing on coal lands and removing coal was the value of 'the coal taken when first severed from its native bed, without deducting the cost of severance; if it is removed by the trespasser, the value can be ascertained at the mouth of the mine, if its value could there be easily established, by deducting from such value the costs of severance and getting the coal to the mouth of the mine.                              pp. 661, 663

*Third*—That said Act of 1894 did not change the measure of damages if fraud, negligence or willful trespass is proven.
                                            pp. 665, 666

*Fourth*—That under the Act there also may be allowed exemplary damages if the coal is taken furtively and in bad faith, and if so taken there may be no deduction in respect of the labor and expense in getting the coal.                              p. 664

*Fifth*—That no different rule of damages was applicable, because the case was in equity, and not at law.                              p. 667

In Equity, findings of the lower Court on questions of fact, are reviewable on appeal.                              p. 657

*Decided April 3rd, 1918.*

Appeal from the Circuit Court for Allegany County. (In Equity.)   (HENDERSON, J.)

The facts are stated in the opinion of the Court:

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*W. Calvin Chesnut* and *Albert A. Doub,* for the appellants.

*Wm. E. Walsh and Walter C. Capper* (with whom was *Wm. C. Walsh* on the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The bill in this case was filed by Andrew Monahan and others, the appellees, against the Mount Savage George's Creek Coal Company, and certain of its officers, to enjoin the

defendants (1) from trespassing upon the plaintiffs' land and mining and carrying away their coal; (2) from removing supports, etc., necessary to keep open the passages through the defendant company's mines leading to the plaintiffs' coal, and (3) from preventing the plaintiffs, their surveyor and helpers from going into the company's mines and thence into plaintiffs' coal, and the places from which said company had carried it away, and from interfering with the surveyor from measuring and ascertaining how much of plaintiffs' coal had been taken and carried away by said company.   There are also prayers to require the defendants to disclose how much of said coal the company had taken, when and to whom sold, to account for that taken, as well as for the damages to the plaintiffs' remaining coal, and for general relief.

The defendants filed an answer in which they denied that they had trespassed upon the plaintiffs' property or removed any coal therefrom, but subsequently they filed an amended answer in which they admitted that the company had sold and marketed coal estimated at 3,250 tons taken from the land of the plaintiffs, admitted that the company had been paid for said coal, and stated that it was ready to compensate the plaintiffs for it.   They denied that "the said coal was worked or removed from the plaintiffs' land fraudulently, negligently or wilfully, but say that the said coal was taken purely by accident, without fraud, and without negligence on the part of the said defendants, and also with the utmost good faith, and with the belief on the part of the said defendants that they were taking and removing coal which belonged only to the Mt. Savage George's Creek Coal Company; and these defendants further say that the defendants ought not to be required to pay for the said minerals more than its value in its native state before severance, to the said plaintiffs."

The defendants in open Court waived "any objection to the jurisdiction of the Court in this case as to the determination of the question as to the quantity of coal removed and the value of the coal, all of which will be determined, and the Court can pass upon the issues in this case the same as if it

were a trial at law and the same as if the case were tried by the Court, sitting as a jury." The attorneys for the plaintiffs assented to that agreement, and it was made a matter of record.

The lower Court adopted the defendants' evidence in regard to the amount of coal taken out of the land of the appellees by the company, the cost of severing, loading and transporting it to the mouth of the mine, and there seemed to be no controversy as to its market value. The principal questions, therefore, to be determined are whether the Court was right in finding that 4,508 tons of the coal were negligently mined, and, if so, what measure of damages should be allowed. We can not agree with the appellees that as it was a question of fact whether the coal was negligently mined, the decision of the lower Court as to that is conclusive and can not be reviewed. In equity cases findings of the lower Court as to questions of fact are reviewable on appeals, and if the agreement referred to above be construed as changing that rule in some respects, it could not have been intended to have such an effect as that contended for. The agreement suggested some uncertainty as to the *mode* of procedure, and the plan of offering instructions was adopted—JUDGE HENDERSON remarking that that could be done so as to secure the right of appeal. Some of the prayers clearly presented the question of negligence, and while bills of exception were not filed, the Judge in his opinion rejected all of the prayers offered by the defendants, except the first which does not refer to that subject. The prayers in the record, together with the endorsement on them of the disposition made of them by the Judge, and the statement in the opinion that "all the prayers submitted by the defendant, except the first, are rejected," must under the circumstances be regarded as sufficiently presenting the right to have his finding reviewed.

1. There is no real controversy about the division line between the properties. That could have been ascertained before the defendant company commenced mining in November, 1916, as well as in March, 1917. Mr. Stern, the presi-

dent of the company, testified that they commenced mining sometime from the 10th to the 15th of November. The Maryland coal and Iron Company formerly operated this mine, and Mr. Stern was treasurer of that company, and Mr. Avery, one of the defendants, was president. Both before and after the defendant company commenced operations Mr. Stern and Mr. Farrell, a director of the defendant company, tried to get a lease of the Monahan coal, but the owners declined to lease it, and warned Messrs. Stern and Farrell not to get over the line. The defendants either knew, or were grossly negligent in not knowing that the workings were at least close to the line, yet, although the line could have been easily and promptly established, it is now said that it was not fixed in the mine until after the injunction was issued. Anthony Monahan testified that on the 5th of November, 1916, Mr. Avery, of the defendant company, told him, "We are up to your line, your property line, and he says, 'We can't go no further if we don't get your coal.' " He told him they would not lease the property—that the heirs were opposed to a lease, and "I told him all we wanted him to do was to keep off our line." Francis Monahan testified that he heard that conversation. Mr. Avery denied it, but said that he understood they were from 75 to 100 feet from the line. Mr. Stern said the reason they were anxious to get the Monahan coal was "because it was very close to our property," and in reply to the question, "You knew it was very close to your workings in there?," he said, "Yes, sir." On cross-examination of Mr. Farrell, in reference to the lease, this appears: "Q. The reason was that you were close to their coal, or on their coal? A. I didn't know it. Q. In a general way, isn't that the reason you tried to get this lease? A. The reason we tried to get a lease was because we wanted their coal. Q. Isn't that the reason—because you were up to it? A. Might have been it. Q. It was it? A. Well, yes." Mr. Spear testified that he went with the defendant company about February 1, 1917,—first as mine foreman and then as superintendent—and "just as soon as I got there I said to Mr. Stern

that we should make some inquiry about the lines," and Mr. Stern employed Mr. Haverstick as engineer. This also appears in his evidence: "Q. Did Mr. Stern tell you it was all right? A. No, sir; he didn't. He didn't say anything about it. He didn't know. I didn't know anything about it until the surveyors told us. Q. Did Mr. Haverstick ever tell you it was all right? A. As soon as Mr. Haverstick made his survey he told me we would have to stop the left. Q. When was that? A. I couldn't tell just when; I couldn't remember the dates." Mr. Matthias, a mining engineer, testified as to the distances the various headings were run beyond the line before the injunction was served. Two of them were run over the line 325 or more feet, one about 400 feet, one about 186 feet, three 150 or more feet, two about 125 feet, and four varying from 75 to 115 feet—although they were not all run at right angles to the line, as shown by the plat, and hence the end of the headings would not be as far beyond the boundary, in a straight line, in some instances as the above figures might suggest.

The evidence was therefore ample to show negligence of a very decided character. It may be that no one actually knew that the defendant company was working beyond the line, but they at least knew that they were near it, and had been warned not to get over it. Why it would take from early in November until after the injunction was served, in March, to find out where the line was is not satisfactorily explained —especially as it was so soon ascertained after the injunction was served. It ought to have been a very simple matter for an engineer to locate a line such as this, about which there seems to be no real controversy. They knew that sometime before the company commenced operations the former company was within from 75 to 100 feet of the line, and some of the officers of that company were officers of this one, yet several of these headings were run between three and four hundred feet beyond the line. The circumstances were such as to suggest the propriety, not to say necessity, of fixing the line in the mines definitely before any coal was taken out

in that direction. Nothing said by Mr. Matthias excused the defendants, unless it be what he told them about the line at the point where the Court below only required the company to pay the royalty of ten cents a ton for coal taken out, but he did not then know definitely where the line was, and the officers and agents of the defendant company had a much better opportunity to know it, as they had access to the mines at all times. The defendants knew he had not connected up the lines with their workings, but after the injunction was gotten out it only took a few days to find out that the defendant had taken out large quantities of the plaintiffs' coal. If the defendants' theory be adopted, all that would be necessary for a trespasser to do would be not to have the lines established until proceedings were taken against him, and then claim he did not know he was over. That will not do in a case such as this, where there was manifestly good reason to fix the line, if the defendant company was anxious to keep within its own boundaries.

2. The next and most important question is the measure of damages to be allowed. The rule in this State was definitely fixed prior to the Acts of 1894 (Ch. 287), which is now Section 92 of Article 75 of the Annotated Code. It may be that the decisions of this Court are not in accord with some of those cited by the appellants from other jurisdictions, but the measure of damages fixed in *Barton Coal Co.* v. *Cox,* 39 Md. 1; *Franklin Coal Co.* v. *McMillan,* 49 Md. 549, and *Blaen Avon Coal Co.* v. *McCulloh,* 59 Md. 403, has not only not been disturbed, but has been recognized in *Parker* v. *Wallis,* 60 Md. 15; *Atlantic, etc., Coal Co.* v. *Md. Coal Co.,* 62 Md. 135, and *Peters* v. *Tilghman,* 111 Md. 227. In the *Barton Coal Co.* case the question was fully argued by some of the ablest attorneys in the State and heard by CHIEF JUDGE BARTOL and JUDGES BOWIE, MILLER, ALVEY and ROBINSON. The Court thoroughly reviewed the English decisions and other authorities and sustained the third prayer of the plaintiffs, which, after referring to certain facts not neces-

sary to repeat, concluded as follows: "then the plaintiffs are entitled to recover such sum per ton as the jury may find the said coal so mined was worth when first severed from its native bed, and before it was put upon mine cars, without deducting the expense of severing said coal from its native bed." It further sustained a prayer to the effect that if the jury found that the defendant knew that the lands were not its own, the plaintiffs were entitled to exemplary damages. The Court said that the rule prescribed in the plaintiffs' third prayer conformed in principle to that in *Martin* v. *Porter,* 5 M. & W. 351; *Morgan* v. *Powell,* 3 Ad. & El., N. S. 278, and *Wild and Others* v. *Holt,* 9 M. & W. 672. In *Martin* v. *Porter,* BARON PARKE ruled, as quoted in the *Barton Coal Company Case,* that the plaintiff "was entitled to the value of the coal *as a chattel* at the time when the defendant company began to take it away, that is, as soon as it existed as a chattel, which value would be its price at the pit's mouth, after deducting the expense of carrying the coals from the place in the mine where they were dug, to the pit's mouth."

JUDGE ROBINSON dissented in the *Barton Coal Co. Case,* and when the case of the *Franklin Coal Co.* v. *McMillan* came before the Court filed a vigorous dissent on the ground that in his opinion the *Franklin Coal Company Case* was distinguishable from that because the defendant contended that the coal was taken under a claim of title. He relied on the case of *Wood* v. *Morewood,* 3 Ad. & El. N. S. 440, and others cited by him, and he quoted from it to show that if there was *fraud* or *negligence* on the part of the defendant, damages could be given on the principle of *Martin* v. *Porter,* but in the absence of *fraud* or *negligence* the damages could be confined to the value of the coal in its native bed. We refer to JUDGE ROBINSON's opinion to show that the question was distinctly raised in the *Franklin Coal Company Case,* but the majority of the Court refused to follow the view contended for and the rule announced in the *Barton Coal Company Case* was followed. It will be noted that in *Wood*

v. *Morewood,* BARON PARKE said that if there was *fraud* or *negligence* the jury could give the damages settled in *Martin* v. *Porter.*

In the *Blaen Avon Coal Company Case,* this Court again followed the rule adopted in the *Barton Coal Company Case,* and repeated in the *Franklin Coal Company Case.* In addition to the English cases cited, the Court referred to decisions in North Carolina, Maine, California and Illinois which announced the same rule of compensation. JUDGE RITCHIE, who delivered the opinion, called attention to the fact that in the Illinois cases, and in *Martin* v. *Porter,* and *Morgan* v. *Powell,* "while the amount to be recovered is fixed by the worth of the coal when first dug, the mode of reaching the value is through the price of the coal after it arrived at the pit's mouth, and allowing a deduction for the cost of conveying it thither from the place where it was mined. This is said to be because it could have no value as a salable article without being taken from the pits, and that was the earliest moment at which the plaintiff could have repossessed himself of the coal. But, as LORD DENMAN, in *Morgan* v. *Powell,* says, 'Instances may be easily supposed where particular circumstances would vary this *mode* of calculating the damage.'" JUDGE RITCHIE then went on to show that where the coal is actually carried away and sold, "It does not seem material in a case like this, whether the value of the coal at the mine's mouth he first ascertained and then an allowance be made for the bare expense incurred in its simple conveyance thither, or witnesses be asked to estimate directly its value just prior to its removal. The rule of compensation is practically observed in either case." See also what he said on page 420 of 59 Md. It is not difficult to see why this is so. The plaintiff is entitled to recover *the value* of the coal per ton, after it is severed, without deducting the cost of severing it—that is to say, its value after it has become a chattel, which it has so become by the illegal act of the trespasser. If it be permitted to lie there without removing it

and the owner has no way to get it out, or did not know of it in time to take it out before the roof fell in, it might be difficult to establish the value beyond what it had in its native bed. But if, as was done in this case, it was removed by the trespasser, and at the mouth of the mine it had a value which is capable of being easily established, that would seem to be the fair and just way to do so. The trespasser surely has no right to complain of that mode being adopted. But the cases, including that of the *Blaen Avon Coal Co.* sufficiently show the reason for the rule to avoid the necessity of further discussion of that subject.

3. The three Maryland cases met nearly every question that was liable to be raised, but the further question now is the applicability *vel non,* of the statute referred to. (Sec. 92 of Art. 75.) We have seen that the rule in Maryland when the statute was passed was that even if the coal was taken under a *bona fide* claim of title the measure of damages was as announced in the *Barton Coal Co.* case while there was a line of cases in England and elsewhere that in the absence of *fraud* or *negligence* only the value of the coal in its native bed would be allowed. In the *Franklin Coal Co. case* CHIEF JUDGE BARTOL said: "Trespasses on the land of another, if not wilful always imply some degree of negligence * * *. As said in *Maye et al.* v. *Tappan,* 23 Cal. 306: 'When a party has the means of ascertaining the dividing line, he is guilty of negligence in not ascertaining its location.'" The first paragraph of the statute is: "In the absence of fraud, negligence, or wilful trespass, the measure of damages for the wrongful working and abstracting of another's minerals is the value of the minerals in their native state, before severance, to the person from whose property they were taken at the time of the taking." It could not be contended that under that alone the measure of damages has been changed, if there was fraud, negligence or wilful trespass, but the statute proceeds with only a semi-colon after the above, "but if one furtively or in bad faith works and abstracts minerals from the land of another, the party so offending may be charged with

the whole value of the minerals taken and allowed no deduc-
tion in respect of his labor and expenses in getting them."
The measure of damages provided in that paragraph is not
materially different from the rule before the Act of 1894,
excepting the party would not be entitled to deduct the cost
of removing the coal to the mouth of the mine (when that
*mode* of ascertaining the value is adopted), if done furtively
or in bad faith.   It does not say "without deducting the cost
of severing the coal," but is to be allowed "no deduction in
respect of his labor and expenses in getting them."   He
might in addition to that be liable for exemplary damages, as
the statute should not be construed to prohibit such damages
if the circumstances justified them.   It would seem to be
clear that the rule in reference to minerals taken negligently
was not changed.   Why it was not, we have no means of know-
ing unless it was simply that the Legislature would not make
such a change, for reasons of public policy.   The work is
done under ground when ordinarily the owner of adjoining
property has little, if any, means of knowing that his prop-
erty is being encroached upon.   Baron Parke, in referring to
the rule laid down in *Martin* v. *Porter* said: "Which is a very
salutary one, because the parties must know—at least, they
may know by proper dialling—that they are trespassing on
their neighbor's property."   The measure of damages fixed
by the first paragraph does not apply, if the party taking the
coal was *negligent,* because it is only *in the absence of fraud,
negligence* or *wilful trespass* that the rule applies.   If "neg-
ligence" as used in the first paragraph, is not embraced in
one of the terms "furtively or in bad faith," as used in the
second paragraph (and it would scarcely be contended that
it is), then there is no part of the statute applicable to a case
where there was negligence, and if it is included, then the
appellant can not complain of the measure of damages al-
lowed, as it even got the benefit of the deduction for the cost
of removing the coal to the mouth of the mines.   But it is
clear that the statute does not change the rule when the min-
erals are taken as the result of the negligence of the defend-

ant.   The fact is that the defendant company was not only getting over the line of the plaintiffs' property, but it was working the coal very close to the line between *good* faith and *bad* faith.   It may be that the officers did not know they were over the line until so informed by the surveyor, after this bill was filed, but they did not know they *were not* over the line and could have easily found out whether they were as it was their duty to do.   But it is not necessary to go further into the question whether the acts of omission and commission of the defendant company amounted to bad faith, within the meaning of that term as used in the statute, as we are satisfied that there was great, not to say gross negligence, and that the statute does not relieve parties guilty of negligence from the measure of damages fixed by our decisions prior to its passage.

The quotation from the amended answer in the first part of this opinion would seem to indicate that the defendants then interpreted this statute as we have done.   If the fact of its being negligently done does not take it out of this statute, or make it inapplicable, then why would the defendants have denied that the coal was worked or removed from the plaintiffs' land *"fraudulently, negligently* or *wilfully"?*   Of course, we understand they were denying that it was so taken, but the inference would be that if taken *negligently* they could not ask for the measure of damages which they claimed to be applicable.

4.   The appellants also contend that inasmuch as the case is in equity, a different rule should be applied.   There are several answers to that.   In the first place the defendants agreed that "the Court can pass upon the issues in this case the same as if it were a trial at law and the same as if the case was tried by the Court sitting as a jury."   That would hardly leave room for the contention that there should be a difference between the amount allowed in this case, and what might have been allowed if the case had been before a jury, or the Court, sitting as a jury.   But beyond that our own decisions are clear on that point.   In the *Atlantic, etc., Coal*

*Co.* v. *Maryland Coal Co.,* 62 Md. 135, 143, after speaking of cases where Courts of Equity would assess damages, it was said: "In a case of trespass where no such relations exist, we are aware of no ground upon which a Court of Equity can set up any other rule of damages than that which prevails at law. The rule for trespass in mining coal is well settled in Maryland * * *. The owner of adjoining property is held to know the boundaries between him and his neighbor. If he has made a mistake *bona fide* as to his title or boundaries in mining coal, the lowest measure of damages applicable is the value of the coal immediately upon its conversion into a chattel without abatement of the cost of severance. If the trespass has been committed through negligence or design, punitive damages in addition may be recovered." Then, after citing the three leading cases in Maryland, the opinion continues: "An unwitting trespasser, merely as such, could not change the amount of his liability by simply changing the forum. No lower measure of damages for trespasses not negligent nor wilful could be substituted in equity for that fixed at law, on general principles, for such trespasses. If a lower measure could be there applied merely bcause the trespasser was honestly mistaken, all such trespassers would seek the Courts of Equity when sued, and thus evade the rule established as applicable to them in the aforegoing authorities."

The appellants quoted an expression used in the *Barton Coal Co. Case,* where, after affirming the rule adopted, the Court said: "The cases to the contrary are generally cases in equity, where greater latitude is assumed by the Court in controlling the rights of the parties," but in the case in 62 Md., where a different rule was sought to be established in equity, this Court announced its views in terms which leave no doubt on the subject, as will be seen by the quotation above.

Again, the theory of the appellants for asking the Court to adopt a different rule in this case, being in equity, is that the amount allowed is out of all proportion to the value of the land. That was urged in some of the English cases, and in

each of the three principal cases in this State referred to
above the amount recovered was far beyond the value of the
land affected.   But the recovery for the most part was not
for the land, but for the value of the coal as a chattel.   The
amount of recovery in this case is large by reason of the
unusual price of coal when it was taken.   That could make
no real difference, however, as by the rule adopted by the
lower Court the appellant company is only held for money
*belonging* to the appellees, which was actually received by it.
It is true that the higher the market value, the more there
is to be returned, but whether small or large it in justice
and equity belongs to the owners of the land from which the
coal was taken.   Upon what principle then ought the Court
to change the rule for the measure of damages at the instance
of the appellants?   The company sold the appellee's coal, and
actually got the money for it.   Should a Court of Equity
give a favorable hearing to a party who comes before it con-
fessing that it took the plaintiffs' chattels, sold them for their
market value (shown to have been $4.90 per ton, and not
denied), and collected the money but asks that it be relieved
from paying any of it except ten cents a ton, because that is
all it was worth in its native bed?   Assuming the very liberal
allowance made by JUDGE HENDERSON for costs in severing
and getting the coal to market (at the mouth of the mine) to
be correct, namely $2.41, the appellant has or had in its
treasury $2.49 per ton profit, made on the sales of the appel-
lees' coal, and yet asks the Court to require the appellees to
accept ten cents a ton in full of all claims for the 4,508 tons
and let it keep $2.39 per ton, or $10,774.12 profits made out
of the coal which was admittedly unlawfully taken from the
appellees by the appellants, although claimed to have been
done in good faith.   That does not seem to us to be equity,
or to give the appellants any standing for relief in a Court of
Equity, if any distinction could otherwise be made, because
the parties are in a Court of Equity.

No contest is made about the 912 tons taken under circumstances which excused the appellants, as held by the lower Court, from paying more than ten cents a ton, amounting to $91.20. The decree also allowed $1,000.00 damages to the remaining land. The rule for the latter is well settled in our decisions and is not affected by the Act of 1894. The only question that could possibly be raised is as to the amount which seems to have been sufficiently proven in this case, and is much less than the appellees claimed. So the only *actual loss* that the appellant company has sustained is the cost of severance of the 4,508 tons which the lower Court fixed at 63½ cents a ton, and in the aggregate is $2,862.58, and $1,000.00 to the remaining coal and land. Indeed in comparing the net results to the appellant company, if it had kept off the appellees' land, with what it is now held for, it would not be out of place to remember that, although the lower Court only charged it with ten cents a ton for the 912 tons, it actually made a profit of $2.49 per ton on those 912 tons, equal to $2,270.88—thus leaving it a net profit of $2,178.68 on those tons. If that be deducted from the cost of severance of the 4,508 tons ($2,862.58), which we have said above is the net loss of the appellant company in the whole transaction, it in reality only loses $682.90, in addition to the $1,000.00 damages referred to. While in his application of the rule established by our decisions JUDGE HENDERSON did not charge the appellant company with that profit, it was undoubtedly made out of the appellees' coal. So although the decree is for a large sum of money, in reality nearly four-fifths of the portion of it allowed for coal negligently taken is to be paid with profits made out of appellees' coal, and if the profits made on the 912 tons be taken into consideration, less than 5 per cent. of the amount allowed for coal negligently taken is in addition to the profits actually received by the appellant company. When those facts are considered, the supposed equities in favor of the appellant company seem to a great extent to disappear.

We have not thought it necessary to discuss the authorities outside of this State, collected with the usual diligence of the attorneys for the appellants and presented, from their standpoint, with force and ability, because we are of the opinion that the decisions of this Court are conclusive of most of the questions raised, and we cannot adopt the construction of the Act of 1894 contended for. As late as 1909 this Court, in *Peters* v. *Tilghman*, 111 Md. 227, applied the rule of the measure of damages laid down in the *Barton Coal Company Case*, and followed by others, to timber taken from another's lands. It would seem to be more important to have such a rule as to coal and other minerals as the owners can not as well protect themselves against trespass, inasmuch as the minerals are under ground. It is for the Legislature to determine the wisdom of such legislation as that of 1894, but as it is contrary to a rule established after most thorough consideration, and is liable to encourage trespasses, if not properly guarded, it should not be extended beyond what was clearly the intention of the Legislature. We are satisfied, after a careful examination and consideration of the facts, the authorities and the Act of 1894 (Sec. 92 of Art. 75 of Code) that the decree of the lower Court should be affirmed.

> *Decree affirmed, the Mount Savage George's Creek Coal Company to pay the costs.*