163 So. 145

STATE v. JEFFERSON ISLAND SALT MINING CO., Inc.

No. 33148.

July 1, 1935.

Rehearing Denied Aug. 30, 1935.

Walter J. Burke, of New Iberia, and Miller, Bloch & Martin, of New Orleans, for appellants.

Gaston L. Porterie, Atty. Gen., Eugene H. Walet, Jr., Sp. Asst. to Atty. Gen., and Emile Pomes and E. Howard M'Caleb, Sp. Assts. to Atty. Gen., for the State.

LAND, Justice.

The statement of the case is made by the trial judge in his opinion as follows:

"The State of Louisiana brings this action in trespass contending that The Jefferson Island Salt Mining Co., Inc. has in its mining operations, encroached upon certain property, the ownership of which is claimed by the State, and thereupon having extracted therefrom a certain quantity of salt. It alleges that the trespass was committed willfully, and is accordingly entitled to damages based upon the value of said salt, which is fixed at the sum of $5,165,280.00, with legal interest from date of judicial demand.

"The property over which the trespass is alleged to have been committed, and of which the State claims the ownership, being the bed of Lake Peigneur, located in the southwestern part of Township 12 S., R. 5 E., in Iberia Parish.

"For answer, the defendant admits mining operations, but denies having conducted its operations on any property belonging to the State. It further alleges that it is the assignee of the salt and minerals in the area commonly known as Jefferson Island, and that the owners (assignors) thereof are J. Lyle Bayless and Lawrence

Jones. That it has confined all of its mining operations within the limits of its assignment as defined by its engineer. It further alleges, in the alternative, that, if through ·error, it has mined any salt under any land belonging to the State, should the State be decreed to have title thereto, then the basis for the computation of the value of the salt is its value in place.

"Further answering in the alternative, it alleges that should the computation be not on the basis of valuation in place, then the value of said salt should not exceed the net after deducting all expenses, the costs incident to the severance, mining, milling, marketing and shipping and other reasonable charges preparatory to making the same marketable.

"Further answering, defendant then sets up its title, by virtue of patents, as riparian owners to the center of said lake. In the alternative, it alleges that should its title be held to be not to the center of said lake, that its title therefore extends to the water's edge.

"Interventions on behalf of J. Lyle Bayless, and Lawrence Jones, residents of the State of Kentucky, and owners in indivision of the property adjoining Lake Peigneur were filed. These intervenors allege ownership of the land in fee, defendant company the minerals in fee. These interventions are directed against the plaintiff, claiming title to a portion of the Lake by virtue of riparian rights.

"In answer to the interventions, the State re-convenes and alleges that the said intervenors are liable, with the defendant company, in solido, for the trespass committed.

"It is shown that the Jefferson Island Salt Mining Co. Inc. holds no title to the lands and claims no rights other than those of lessee, under a mineral lease granted to it by the intervenors.

"It is further shown that the intervenors own Sections 58 and 59, bordering on the Lake. That, as riparian owners, they claim the ownership of the bed of the Lake fronting their property to the center thereof.

"It is likewise shown and conceded that the State now has, and has had the actual physical possession of the Lake.

"The State's suit is founded upon the contention that Lake Peigneur was a navigable lake in 1812, when Louisiana was admitted as a State into the Union. Their second contention is that the Lake being navigable in 1812, all of its bed below ordinary high-water mark became the property of the State in virtue of their inherent sovereignty. That its title was original and not derivative.

"The State further contends that the bed of the Lake comprises all the land between the meander line of the Lake and the present water level as established by the survey of John Boyd in 1844.

"The contention of the defendant and intervenors is that the Lake was a non-navigable lake in 1812, and is non-navigable today, and that under their Spanish grants, as riparian owners, their ownership runs to the middle of the lake bed."

■ The exception of no right or cause of action filed by the defendant, the Jefferson Island Salt Mining Company, Inc., is clearly without merit, since the state, as alleged owner of Lake Peigneur, charges the defendant with willful trespass upon its property, and sues for a moneyed judgment for salt mined, sold, and taken away from said property by defendant. Taking the allegations of plaintiff's petition as true, a right or cause of action has been clearly set forth.

■ The denial in the exception of the state's title and the setting up in defendant of rights as a riparian proprietor are matters that relate to the merits of the case, and must be placed in an answer.

■ It is also clear that defendant's allegation, in the alternative, in the exception that the state cannot maintain this suit, because it has leased the bottom of Lake Peigneur to the Jefferson Oil Company, and the lessee has pending in the United States District Court, Eastern District of Louisiana, a suit against defendant in which it urges the same claim as herein urged by the state, is a plea in abatement or application for stay of proceedings and is bad, because the two suits are not before the same court, and not between the same parties, and not founded on the same cause of action.

The state's case here is based on ownership and possession of the realty comprising the waters and bed of Lake Peigneur, and it alleges such ownership and possession of all the minerals thereunder, whereas the federal court claimant is suing there as holder of a "right" to extract

these minerals, that is to say, a personal servitude in the nature of a limited usufruct or a servitude sui generis as evidenced by the lease. And further, the suit here is for a moneyed judgment and nothing more, while the federal suit of the Jefferson Oil Company is one for accounting against defendant as trustee ex maleficio of the "right," and an injunction to prevent further trespassing on that right.

■ Again, by whatever name, this exception is bad, because defendant sued in trespass "cannot plead in bar that other persons have sued him for the same trespass," as was held in Jackson v. Larche, 11 Mart. (O. S.) 284, in which this court said:

"It is next pleaded that certain persons, viz, J. Mitchell, A. Lemoyne, and J. Lambert, have instituted two suits in the parish court, claiming damages from the defendant, by reason of the injunction obtained in the suit against Mitchell. We think the present plaintiff cannot be affected by these proceedings: his injuries are not theirs, nor have they a right to vindicate them. A judgment has not the authority of the thing judged, unless it is between the same parties: a fortiori, the pendency of an action between others, cannot have the effect of suspending the exercise of legal rights in a third person."

The exceptions were properly overruled by the trial judge.

Bayless and Jones, residents of Kentucky, filed their petition of intervention claiming ownership of sections 58 and 59 adjoining Lake Peigneur; that the defend-

ant is lessee thereof and was and is conducting mining operations thereon under a mineral lease from interveners; that the premises trespassed upon by defendant was or is a nonnavigable lake, and, by virtue of their title to sections 58 and 59, they owned the lake to its center; that the mineral lease granted by them to the defendant authorized mining operations under the lake and they prayed that the state's suit be dismissed and that as riparian proprietors they be declared the owners of the lake ratably with other riparian proprietors to its center.

The state answered the intervention substantially denying the facts therein stated, except as to interveners' ownership of sections 58 and 59; it averred that interveners had recognized the state's ownership and possession of the lake by reason of their recognition of the state's title and possession, and it reconvened by alleging and proving that they had recognized the defendant corporation for the purpose of mining salt, and, as owners of sections 58 and 59, had granted to that corporation so organized by them certain mineral rights thereon in exchange for its entire capital stock and at all times since its organization interveners were its sole stockholders, officers and directors, and the trespass complained of was originated, directed, and participated in by them, well knowing of the state's rights, and, as joint tort-feasors, they were solidarily liable with the defendant for the damages claimed. Tr. Vol. 1, p. 40.

Interveners moved to strike out the state's reconventional demand on the ground that it was not sanctioned by law, that it states no cause of action, and by reason of their being nonresidents of the state, the court was without jurisdiction to hold them in personam for a money judgment. Tr. Vol. 1, p. 49.

■ By intervening, an intervener submits himself to the jurisdiction of the court. Rives v. Gulf Ref. Co., 133 La. 178, 189, 62 So. 623; Parish v. Holland, 166 La. 24, 27, 116 So. 580; Succession of Hoover v. York & Hoover, 30 La. Ann. 752.

■ By uniting with defendant in resisting the claims of plaintiff, these interveners have assumed and are given the status of a plaintiff in relation to the state. Code Prac. arts. 389, 392, 393; Clapp & Co. v. Phelps & Co., 19 La. Ann. 461; St. Charles St. R. Co. v. Fidelity, etc., Co., 109 La. 491, 33 So. 574; Johnson v. City of New Orleans, 105 La. 149, 153, 29 So. 355.

Accordingly, as between interveners and the state, they are plaintiffs and the state defendant, and, as such, it is required to plead as in ordinary suits. And being defendant quoad interveners, the state's reconventional demand against nonresident plaintiffs, for any cause, is good. Rigney v. Monette, 45 La. Ann. 940, 13 So. 201.

Interveners' motion to strike out the reconventional demand of the state was properly overruled.

■ Plaintiff filed a supplemental and amended petition, seeking judgment for additional damages to that originally sued for, based upon the continued alleged tres-

pass of defendant and the consequent mining and removal of salt from the date of the filing of the suit.

Defendant's motion seeking to set aside and dismiss the supplemental petition on the ground that the issues tendered by it are foreign to the issues presented in the original petition and change same materially was properly overruled.

The trial judge in his opinion denying the motion says:

"In the case at bar, the additional damages sought are conditioned upon the trespass originally pleaded and cannot work any hardship or injury to the defendant in the final analysis. The allowance of this supplemental petition does not work any delay occasioning injury or denial of due process. It has been seasonably served on defendant and thus affords reasonable time to meet the issue, and that issue being a demand for increased damages, based upon a continued act originally pleaded as a cause of action," citing Code Prac. art. 419; Gasquet v. Johnson, 1 La. 425; Mader v. Fox, 15 La. 132; Saia v. Lusco, 155 La. 191, 99 So. 34.

Our jurisprudence has been uniform to the effect that as a general rule amendments to pleadings should always be allowed in promotion of justice, where they cause no injury, provided they do not change the substance of the demand nor the issues presented. We find no error in the trial judge's ruling.

In our opinion, the trial judge has made a correct analysis of the questions to be determined by this court in handing down an opinion herein, as follows:

First. Was Lake Peigneur a navigable lake in 1812?

Second. The legal consequences of navigability as opposed to the title of defendant and interveners as riparian owners.

Third. The ordinary high-water mark of the lake in 1812.

Fourth. The trespass, if any committed, and the extent thereon.

Fifth. The quantity of salt removed, should it be held that a trespass has been committed.

Sixth. If an appropriation was made, whether it was done in bad faith.

Seventh. The amount of damages, and a question of law as to the nature of defendant's and interveners' liability.

The trial judge treated the subject of the navigability of the lake in 1812 at length and thoroughly reviewed all the testimony and exhibits presented. A careful check of the exhibits and testimony by this court leads us to affirm the trial judge's conclusion; that Lake Peigneur was a navigable body of water in 1812.

In 1778, Joseph Prevost, in his petition for a grant, describes "La Butte a Peigneur" as an island bounded by a lake and further advises that "Monsieur le Commandant made reply to me that he would have granted this to me willingly, but since the place seemed fit to build a fort there, he had thought he should reserve it for the use of his Majesty, that he had given an account of it to your Lordship and that

he was waiting your Decision to dispose of it." (P. 219.) This document undoubtedly establishes the fact of the existence of Lake Peigneur in 1778, prior to the time that the state of Louisiana was admitted to the Union in 1812. It is worthy of comment that the authorities had considered reserving this property as a fort and that the property is described as an island, which would make it perfectly apparent that the waters surrounding this island were navigable in 1778.

Various ancient maps have been introduced in this case by plaintiff as follows:

(1) P. 37½: A map of the state of Louisiana with part of the Mississippi territory, by William Darby, with the further notification that the map was prepared from an actual survey. The map bears the date, "Entered according to act of Congress the 8th day of April, 1816, by William Darby." This map clearly indicates Lake Peigneur, although it is not so named, on the map, and clearly indicates an outlet running from the southwestern portion of the lake into Vermilion Bay.

(2) P. 103: Map by Weimar bearing the date of 1824. This map shows clearly Lake Peigneur and indicates one outlet from the lake on the south side of the lake and another outlet on the eastern side of said lake, both of which outlets converge prior to flowing into Vermilion Bay.

(3) P. 38: Map by Maxfield Ludlow, which clearly indicates an outlet from the southwestern portion of the lake and also an outlet from the eastern portion of the lake, both of which run separately into Vermilion Bay. This map was copyrighted at Philadelphia on July 28, 1817.

(4) P. 40: Map by John Melish, which indicates practically the same condition of Lake Peigneur with two outlets to Vermilion Bay as indicated by the Ludlow map. This map apparently bears the date of 1820.

(5) P. 39: Map by H. S. Tanner, which was entered according to Acts of Congress on the 20th day of December, 1820, which clearly indicates Lake Peigneur and indicates two outlets to the Gulf, as indicated by the maps of Ludlow and Melish.

(6) P. 41: Map by Mr. G. W. R. Bailey, civil engineer, which is dated 1853, which indicates that there has been a distinct change in the outlets to the Gulf at that time and Lake Peigneur does not appear in this map as connected with the Gulf, but one of the connections previously noted as leading from the eastern portion of the lake is still shown beginning a short distance from the lake and going to Vermilion Bay.

A review of the testimony of various witnesses appearing in this case leads this court to the conclusion that the lake was not only susceptible of navigation, but that actual navigation took place on the lake within the memory of living witnesses. It is not contended, nor does it have to be proven, that this lake was a great artery of commerce, but certainly the navigation which took place on this lake was in conformity with the needs and adequate to the purpose to which it was put by the community which it served.

Historical and geological works are included in the record and exhibits which offer further evidence of the navigability of Lake Peigneur.

A statement by Mr. Walter J. Burke, attorney for defendant herein, in a letter (p. 4) addressed to Mr. Fred J. Grace, bearing date of April 2, 1931, is interesting in connection with this question of navigability. The following paragraph is quoted from this letter:

"A serious question arises, however in so far as affects Lake Peigneur in case the State Highway should traverse any such canal with a bridge. There is at present a bayou extending from the Lake into one of the bayous leading to the Gulf. This was originally a lake outlet widened by General Myles to suit his purpose."

The law applicable to the navigability of Lake Peigneur in 1812 is thus correctly stated in the opinion of the trial judge:

"It has been constantly announced by the Courts of this State, and by the United States Supreme Court that a body of water is navigable in law, when it is navigable in fact.

"In the case of [The Daniel] Ball v. United States, 10 Wall. 557 [563, 19 L. Ed. 999], it is concisely stated:

"'Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'

"In [United States v.] The Montello, 20 Wall. 430 [441, 22 L. Ed. 391], it was said:

"'The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway.' McGilvra v. Ross, 215 U. S. [70] 74 [30 S. Ct. 27, 54 L. Ed. 95].

"In the case of Goodwill et al v. Police Jury et al., 38 La. Ann. 752, quoting from syllabus:

"'A watercourse will be held to be a navigable stream when in its natural state it is such as to afford a channel for useful commerce.' See State v. Sweet Lake Land & Oil Co., 164 La. [240] 248 [113 So. 833]. Delta Duck Club v. Barrios, 135 La. [357] 360 [65 So. 489].

"From the whole therefore, from the witnesses who were able to give testimony in regard to facts bearing upon the issue of navigability, such as the actual navigation by water craft, and the physical conditions of the stream within their knowledge; through the examination of historical records, of surveys; through the consideration of the opinions of engineers, and the geologists, based upon a study of the physical characteristics of this Lake, I

am forced to conclude that at the time of the admission of the State in the Union, this Lake was a navigable body of water.

"Taking the record as presented on the question of navigability, we find that the main contention as to an outlet from the Lake to Vermilion Bay on the part of the State, is a stream, which is shown on ex. P. 50, styled as Delcambre Branch Canal. This Canal, during the course of time, was given several appellations, such as 'Petit Bayou', 'Grand Mare Coulee', and 'Bayou Carlin'.

"Having determined the navigability of the Lake itself, I am forced to likewise conclude from the historical records, and from the testimony of the inhabitants, though they be at variance with each other in some respects, that the outlet which I have termed Bayou Carlin contained a channel in the marsh of sufficient depth to afford communication, in small boats, with Vermilion Bay. It is admitted that the channel of that Bayou ran up to the marsh. Evidence has been offered to show that sixty years ago, a channel was made through the marsh by the inhabitants, through the cutting of weeds and the driving of cattle for a distance of one and three-quarters miles. It is likewise shown that this marsh periodically contained water, though at other times going dry. However, in spite of these facts, there can be no doubt in my mind that this Bayou, even though its channel in the marsh was of a very limited nature, in its service, was sufficient for purposes of communication.

"In the case of Smith v. Dixie Oil Co., 156 La. 691 [101 So. 24, 28], the Court therein stated,

"'While in its present condition, and measured by present-day standards, Black bayou is nonnavigable, in the year 1812, and prior thereto, it was capable of being navigated to a point about three-quarters of a mile above its junction with the so-called Sewall's canal. At that date, therefore, it was, in law, a navigable stream whether it was actually so used or not.' (Authorities cited.) Burns v. Crescent Gun & Rod Club, 116 La. 1038 [41 So. 249]."

It is, therefore, concluded that Lake Peigneur was a navigable body of water in the year 1812, at the time that the state of Louisiana was admitted into the Union.

We next come to a consideration of the legal consequences of navigability as opposed to the title of defendant and interveners as riparian owners.

The following exhibits were presented to the court by the defendant in establishing its chain of title to the lands owned in fee by Bayless and Jones on which a lease was executed covering the mineral rights on said property to the Jefferson Island Salt Mining Company, Inc.: D-80, D-81, D-82, D-83, D-84, D-85, D-86, D-87, D-88, D-89, D-90, D-91, D-92, D-93, D-94, D-95, D-96, D-97, D-98, D-99, D-100, D-101, D-102, D-103, D-104, D-105, D-106, D-107, D-108, D-109, D-110, D-111, D-112, D-113, and D-114.

This court has carefully read the description of property purported to be conveyed by each instrument enumerated above and fails to find any effort or attempt of any vendor to sell, convey, or in anywise dispose of any of the lake bed of Lake Peigneur.

Invariably, Lake Peigneur has been used as the final boundary of the property.

The following language is uniformly used through all of these deeds in reference to any property abutting on the lake:

"On * * * of Lake Peigneur."

"Bounded * * * west by said Lake Peigneur."

"Arpents front on Lake Peigneur."

"Front on Lake Peigneur."

As the burden of proof is on the interveners Bayless and Jones to establish a clear title to the bed of Lake Peigneur, it is perfectly apparent, from a careful reading of the chain of title which they have filed in evidence, that none of the deeds purport to in anywise convey any portion of said lake bed of Lake Peigneur. (Tr. Vol. 2, pp. 353–362; Vol. 3, pp. 363–536; Vol. 4, pp. 537–660.)

The first instrument of this chain of title is dated March 7, 1820, and the last instrument of this chain was recorded December 27, 1920. It seems apparent from the numerous transfers of this property—thirty-four in number—through a period of approximately one hundred years, that, had any of the owners of this property claimed, or had any intention to claim, the bed of Lake Peigneur as a part of their

holdings, an effort would have been made to transfer the property in some of these deeds, or to withhold that portion of the property situated in the bed of Lake Peigneur from the deeds.

By reference to Exhibits P–32, P–33, P–34, D–75, and D–77, it is noted that patents from the United States government covering the land in sections 58 and 59, presently owned by interveners Bayless and Jones, and under lease to Jefferson Island Salt Mining Company, Inc., were issued in strict conformity to the "approved field notes of John Boyd, deputy surveyor," and plats in each instance form a part of the documents, traced in conformity with the Boyd meander line on the lake shore frontage of the property.

As to the legal consequence of navigability as opposed to the title of defendant and interveners as riparian proprietors, the trial judge says:

"Having determined that Lake Peigneur was a navigable body of water at the date of the admission of Louisiana into the Union, the next question concerns itself with the legal consequences of such a conclusion, and this in relation to the rights of the State as opposed to riparian rights.

"In the case of State v. Bayou Johnson Oyster Co., 130 La. 604 [58 So. 405, 407], the Court therein stated:

"'The jurisprudence of the country is now settled to the effect that, upon the acquisition of territory by the United States, whether by cession from one of the states, by treaty with a foreign country, or by discovery and settlement, the title to,

and control of, all the tide lands became vested in the government, "for the benefit of the whole people, and in trust for the several states, to be ultimately created out of the territory"; that, though the United States, whilst holding territory, as such, may grant, for appropriate purposes, titles or rights in the soil below high-water mark, they have never done so; * * * that the states admitted into the Union since the adoption of the Constitution became at once entitled to the soil under their navigable waters, the same as the original states, and that nothing therein remained to the United States save the public lands, which do not include lands below high-water mark.'

"In the case of State v. Capdeville, 146 La. 94 [83 So. 421], quoting from syllabus:

" 'The beds of navigable streams, lakes, etc., never belonged to the United States, but were the property of the states in virtue of their inherent sovereignty, so that once a body of water is found to be navigable, the bed or bottom must be held to be the property of the state.'

"In the case of Smith v. Dixie Oil Co., 156 La. 691 [101 So. 24, 28], the Court therein held, quoting:

" 'Since Black bayou was a navigable stream at the date of the admission of Louisiana into the Union, all of its bed below its ordinary low-water mark became the property of the state, subject to the right of the public to navigate it and use its banks, in virtue of the state's inherent sovereignty.'

"In the case of State v. Bozeman, 156 La. 635 [101 So. 4, 6], the Court said, quoting:

" 'The title of the state is dependent upon the navigability of Cross Lake in 1812, the date of the admission of Louisiana into the Union. If at that time the lake was a navigable body of water all of its bed below high water mark became the property of the state in virtue of her inherent sovereignty. The state's title was original, and not derivative.'

"In the case of Scott v. Lattig, 227 U. S. 229 [33 S. Ct. 242, 243, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107], the Court said, quoting:

" ' "All navigable rivers within the territory occupied by the public lands shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both;" and of this provision it was said in St. Paul & P. R. Co. v. Schurmeir, 7 Wall. 272, 288, 19 L. Ed. 74, 78, "The court does not hesitate to decide that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter [but, that the title to lands bordering on the latter], but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be and remain public highways." '

"Quoting further:

" 'Besides, it was settled long ago by this court, upon a consideration of the relative rights and powers of the Federal and state governments under the Constitution, that lands underlying · navigable waters within the several states belong to the respective states in virtue of their sovereignty, and may be used and disposed of as they may direct, subject always to the rights of the public in such waters and to the paramount power of Congress to control their navigation so far as may be necessary for the regulation of commerce among the states and with foreign nations, and that each new state, upon its admission to the Union, becomes endowed with the same rights and powers in this regard as the older ones.'

"Bearing in mind then, that the Lake was a navigable stream upon the admission of the State into the Union, it is apparent, first, that at that time, the ownership of the bed of the Lake passed from the United States to the State. This right to ownership inhered in the State in its sovereign capacity. It was an original title. With this, however, is a second limitation that the subsequent disposal by the State of the fractional sub-divisions bordering the Lake, carried with it no right to the bed of the Lake, save as the law of this State may have attached such a right to private riparian ownership.

"The defendant and intervener trace their title to Spanish grants, and subsequently confirmed by acts of Congress. This, they contend is the basis of their riparian rights to the center of the Lake.

"This contention may be answered by no less an authority than the Supreme Court of the United States, in the case of Barney v. City of Keokuk, 94 U. S. 324 [24 L. Ed. 224], in which it was declared that it is against public policy for the ownership of the soil below the water surface of a navigable body of water to be vested in a private individual.

"In the case of Slattery v. Arkansas Natural Gas Co., 138 La. 793 [70 So. 806], the court cited the decision in the matter of McGilvra v. Ross, 215 U. S. 70 [30 S. Ct. 27, 54 L. Ed. 95], wherein it was held that:

" 'The contention that rights below the high-water mark of navigable nontidal waters can be asserted by the patentees from the United States as appurtenant to the uplands conveyed to them, as against the title of the state when subsequently admitted into the Union, is too clearly unfounded.'

"The Court further going on to hold that a State admitted after the issuance of a patent, stands upon no different footing from one admitted prior to such issuance.

"In the case of Scott v. Lattig, quoted supra, the Court therein said:

" 'Proprietors of lands bordering on navigable rivers, under titles derived from the United States, hold only to the stream.'

"It appears, therefore, that the rule of property recognized in this State, and by the United States Supreme Court, under titles emanating from the United States, and even though acquired by a treaty with

a foreign country, that a sovereign State is vested with title to the body of all navigable waters, and that the riparian proprietors hold their titles subject to this rule. In other words, the fundamental rights of the State as the sovereign to the ownership of the beds of its navigable waters, must be literally read into the titles of all lands bordering on such waters. State v. Bozeman, 156 La. 635 [101 So. 4].

"Therefore, in view of the above, I am constrained to hold that this Lake having been shown to be navigable upon the admission of Louisiana into the Union, that accordingly, by virtue of its inherent sovereignty, it is the owner by original title of what constitutes the bed thereof, and that the riparian rights are confined solely to the high-water mark."

By reason of the findings that this lake was a navigable stream at the date of admission of the state of Louisiana into the Union, it is held that, by virtue of the state's inherent sovereignty, it is the owner by original title of what constitutes the bed of the lake and that the riparian rights are confined solely to the high-water mark of the lake.

It is now necessary for this court to consider and fix the ordinary high-water mark of Lake Peigneur in 1812.

The trial judge, in his opinion, sums up the state's contentions as to the mean high-water mark in 1812, as follows:

"The State contends in its exhaustive brief that the Court should either accept the Boyd Meander Line as the ordinary high-water mark, or an arbitrary line to be established between the Boyd line, and the twelve-foot mean high-water line, the latter as fixed by the geologists." (Tr. Vol. 1, p. 105.)

After discussing these contentions in his opinion at length, with numerous citations from the exhibits and the transcript, the trial judge arrives at a conclusion as to these points of the case, as follows:

"Accepting neither the Boyd meander line, nor the twelve-foot contour as the ordinary high-water mark, in fixing the elevation of the water level as of the date of the admission of the State of Louisiana into the Union, I am firmly convinced that this high-water mark can be fixed at contour line three feet above mean gulf level. This conclusion is based upon the evidence as I have feebly attempted to review in detail." (Tr. Vol. 1, pp. 114, 115.)

The evidence which the trial judge refers to as having reviewed is apparently referred to in his opinion (Tr. Vol. 1, pp. 105 through 114), and in the opinion of this court his review of the testimony and exhibits contained in this portion of his opinion might be convincing as to the contentions of the state in reference to the Boyd meander line or the 12-foot contour line being the mean high-water mark of the lake, but this court finds nothing in the opinion of the judge a quo that would lead him to the inescapable conclusion that the mean high-water mark of the lake was 3 feet above mean gulf level, at the time the state of Louisiana was admitted into the Union in 1812.

The court below has fallen into error as regards the interpretation of certain exhibits in the case, which errors this court is inclined to believe influenced the judge a quo in arriving at his decision.

In his discussion of Exhibit P–50 (Tr. Vol. 1, p. 105), the statement is made that point A is at an elevation of 4 feet above mean gulf level. An examination of this exhibit shows point A to be between 5 and 6 feet above mean gulf level, and point A on P–60 is shown to have an elevation of 5.58 feet. It is to be noted that this point is situated on the Lemaire Canal. The judge correctly states the elevation of points 37, 35, 34 (which is bayou No. 1), and 2. However, in reference to point 15, the judge states the elevation is 6 feet, whereas an examination of the exhibit shows the elevation to be 10 feet. At point M he states the elevation at 4 to 5 feet, whereas an examination of the exhibit shows the elevation to be 6 feet. The statement is further made that the elevation from points 19 to 21 is 6 feet, whereas an examination of the exhibit shows the elevation to be 7 feet and above. The judge a quo correctly states the elevation between points 21 and 22 as from 6 to 7 feet. Between points 25 and 26, the judge a quo states the elevation is 3 feet above mean gulf level, whereas an examination of the exhibit discloses the fact that point 25 has an elevation of 11 feet and that point 26 has an elevation of 8 feet. These points are on steep banks and immediately behind them the elevation shown between points 25 and 26 is between 12 and 16 feet above mean gulf level. The elevation of the water in the lake on this exhibit—P–50—is shown at 3 feet above mean gulf. All of these points are located on the retracing of the Boyd meander line on Lake Peigneur as it was in 1932. The judge falls into error in his opinion when he states: "These elevations represent, particularly in these areas, the high points of the rim of the lake." As this exhibit, P–50, and Exhibit P–60, as well as the testimony of the engineers both for the state and the defense conclusively show that there is a ridge which circles the lake back from the present water's edge in the lake which almost uniformly has a higher elevation than the points at which the judge a quo established the elevation on the Boyd meander line, it is the contention of the state that this ridge, or bank, is in fact the true bank of Lake Peigneur.

The trial judge makes the statement that there is an area south of the lake which is of an elevation of from 1 to 2 feet mean gulf level. A careful check of exhibits and review of the testimony fails to disclose any such elevations in the proximity of Lake Peigneur with the possible exception of the bottoms of outlets of the lake.

The judge a quo further states that Exhibit D–22 shows that the area southeast and northeast of the lake runs from 4 to 8 feet above mean gulf level. We have carefully examined Exhibit D–22 and find that it is a map prepared by Mr. F. P. Gandolfo, Jr., surveyor, who testifies for the defendants and this map merely purports to show how much of the territory adjoining the lake would be inundated if

the water level in the lake were at an elevation of 8 feet above mean gulf, and this water were projected without any diminution in height over an area of 6,500 acres of land. (Tr. Vol. 7, pp. 1393, 1406.) We fail to note any elevation on this said exhibit which indicates the 4-foot mean gulf level.

At this time, it seems appropriate to further discuss this Exhibit—D–22. Mr. Gandolfo, according to his testimony, assisted Mr. Waddill, engineer, who also appeared for the defense, in the preparation of Exhibit D–3, and utilized a part of the data which was compiled in the preparation of Exhibit D–3 in preparing D–22. (Tr. Vol. 7, pp. 1375, 1388, 1400, 1401.) Mr. Waddill, in testifying in reference to Exhibit D–3 which was prepared by himself and Mr. Gandolfo, testified as follows:

"Q. But your elevation 2 as you show on your map D–3 this is not mean gulf level two feet, is it?

"A. No. It is the two-foot contour above what I consider the normal elevation of the Lake. My zero, from which that two-foot is measured, was practically a foot above mean gulf level so that my 2 corresponds with Ricketts' 3. And Ricketts' 3 is 3 feet above mean gulf level, as I understand it. So that my contours are one foot lower, altho they are equivalent to Ricketts' contour, to that extent." (Tr. Vol. 8, pp. 1616, 1617.) (Mr. Ricketts testified as engineer for the state.)

It is consequently apparent from Mr. Waddill's testimony that he and Mr. Gandolfo arbitrarily set up a level 1 foot higher than mean gulf level which they treated as mean gulf in the preparation of their contours on Exhibit D–3 and as Mr. Gandolfo utilized this data in the preparation of his map—Exhibit D–22—unquestionably his map purports to show conditions of the surrounding territory with water projected thereon at an elevation actually 9 feet above mean gulf, rather than 8 feet above mean gulf as indicated by this map. Mr. Gandolfo further admits in reference to D–22 that the actual field work which he did in the preparation of this map consumed three days and that he took between 150 and 200 elevations in a territory comprising 6,500 acres of land. (Tr. Vol. 7, pp. 1393 and 1406.) This court certainly doubts the accuracy of this map, especially when Mr. Gandolfo admits on cross-examination that considerable acreage is shown inundated on his map which has an elevation of 9, 10, and 12 feet above mean gulf level. (Tr. Vol. 7, pp. 1402, 1403, and P–81.) In view of the method used in preparing the map, D–22, as to elevations, it cannot be considered inconsistent that land with a 9-foot elevation was shown as inundated on the map.

The judge a quo, in his opinion, seems to attach some importance to the fact that the retracing of the Boyd meander line on the lake as it existed in 1932, the Boyd survey having been made in 1844, in one or two instances traverses sections of water. The court further comments that this line traverses the lake in two places, and evidently refers to sections of the lake between points 25 and 26 and points 6 and

7 on Exhibit P–50. The judge makes the same error he previously made in connection with the elevation of these points when he states that they were at the 3-foot above mean gulf level. The correct elevation of point 25 is 11 feet above mean gulf, and it is perfectly clear from the map, P–50, that this point is on a rather steep bank with an elevation immediately back of the point of 12 feet, and point 26 has an elevation of 8 feet, and is also situated on a steep bank, with an elevation immediately back of the point of 17 feet. The elevation of point 6 is between 8 and 9 feet; the elevation of point 7 is 9 feet, and these points are located on a steep bank which attains an elevation of 12 feet immediately back of the points. When the true elevations of these points are considered, it would not have been unnatural for Boyd to have run his original traverse of the lake in this manner, but in view of the fact that the record is full of testimony to the effect that the banks of this lake not only were composed of soil subject to much erosion, but that a large amount of erosion had actually taken place, and consideration is given to the fact that eighty-eight years intervened between the time that Mr. Boyd ran his original traverse of the lake and the time that this meander was relocated in 1932, it is remarkable to this court that there are not more discrepancies than actually appear on this exhibit. We therefore cannot follow the judge a quo in attaching any importance to this slight discrepancy, especially after correcting his error as to the elevation of certain sections of the banks of the lake.

The trial judge attaches considerable importance to evidence presented by the defendant to the effect that a portion of sections 58 and 59, described in early documents as "Butte a Peigneur," was settled about 1770 and that this property has been inhabited and certain portions of it cultivated over a long period of ensuing years. The attention of this court is focused on the mean high-water mark in the lake in the year 1812, and the various exhibits offered by the defendant at a date subsequent to this date indicating that portions of the land had been cultivated, do not afford very much assistance to the court in solving the problem of the mean high-water mark in the year 1812. The only document which purports to throw any light on this subject is Exhibit D–76. This is the testimony of one Joseph Andrus taken on December 30, 1813, as a matter of confirmation of the Joseph Carline grant, in which he testifies that a portion of the property was inhabited and in cultivation thirty-one years previous to that date. It is interesting to note in connection with the description of the property that "Butte" is properly translated in English as a hill. By reference to P–50, it is noted that a small portion of this property has an elevation of 60 feet above mean gulf. There is a slightly larger area with an elevation between 20 and 30 feet. From these higher elevations, the property gradually slopes off, always embracing larger areas as the elevation goes down, to where there is a considerable area of this property with an elevation of 8 feet above mean gulf. As a matter of fact, the lowest elevation shown in sections 58 and 59

on map P–50 is 6 feet, and this elevation is applicable to not in excess of 20 per cent. of the property facing Lake Peigneur in sections 58 and 59 shown on this map. A great majority of this property, still referring to Exhibit P–50, is at an elevation of 8 feet or above mean gulf, and by reference to P–89, it is noted that 300 acres in this tract have an elevation of 10 feet above mean gulf. This certainly indicates to this court that full significance may be attached to Exhibits D–76, D–81, D–82, D–92, and D–95, which all have reference to portions of this property in sections 58 and 59 being inhabited and cultivated, and still permit a much higher elevation of water in Lake Peigneur as the mean high-water mark in 1812 than the 3-foot above mean gulf level arrived at by the lower court.

The lower court comments on D–94 (Tr. Vol. 3, p. 399) which was the sale of property in sections 58 and 59 for the sum of $60,000 cash. By reference to D–94, it is noted that the sale price was for land, improvements, and chattels, including fifty-two slaves. There is no separate consideration shown for the land.

The judge a quo devotes a paragraph of his opinion to the alleged location of a sugar house mentioned in the Boyd field notes which he states was located by an engineer for the state (Mr. Ricketts) at point R–7 on Exhibit P–50. In this connection Mr. Ricketts' testimony on redirect examination is interesting, as follows:

"Q. You don't know whether a sugar house was there?

"A. No. And I don't show it. It is just a field mark." (Tr. Vol. 7, p. 1205).

The lower court apparently totally disregarded Exhibits P–154 and P–155, which are photographs with a map identified with the photographs which was prepared by Mr. Ricketts with explanatory note that the map was prepared for the purpose of clarifying his interpretation of the Boyd comment in reference to the sugar house. It is interesting to note that Mr. Ricketts actually locates the sugar house on this map at an elevation of approximately 13½ feet above mean gulf, well outside of the Boyd meander line. In the light of this evidence the possible importance of the elevation of the sugar house is eliminated.

The judge a quo makes an erroneous comparison between points 13 and 14 on the Boyd meander line as shown on Exhibit P–50 with elevations of approximately 38 and 43 feet, respectively, and points J–6 and J–7 on the Johnson meander line, which he states are at elevation of approximately two feet above mean gulf level. By reference to Exhibit D–2, point J–7 has an elevation of approximately 35 feet and point J–6 has an elevation in excess of 32 feet. This line as depicted on D–2 does cross what is indicated as a cypress swamp. This line is not comparable with the line between points 13 and 14 on P–50 as these lines are some 2,600 feet apart and run parallel. J–7 is, on the contrary, near point 11 as depicted on D–2 and P–50 and intersects the Boyd meander line between points 14 and 15, as depicted on these same exhibits.

Exhibits P–156, P–157, and P–158 and the testimony of Mr. Ricketts, testifying for the state (Tr. Vol. 9, pp. 1810 through 1815), together with the large discrepancy noted in the preceding paragraph between the Boyd and Johnson lines, cast serious doubt on the accuracy of the Johnson meander line, although the judge a quo states that the survey was approved by the surveyor general. The record discloses the fact, however, that the surveyor general's office contracted with John Boyd to make a resurvey of this same area in 1844 and it further discloses the fact that the Boyd survey is the only complete survey made of this area by the United States government.

In view of the discrepancies testified to by Mr. Ricketts, engineer (Tr. Vol. 9, pp. 1810 through 1815), in the Johnson survey, and the further fact that point J–10, as shown on Exhibit D–2 in Johnson's meander line, is located in the lake and even outside of Waddill's meander of the same section of the lake in 1932, which latter line attempts to depict the shore of the lake as it would be in the event the dam in the Delcambre Branch Canal were removed, this court can readily understand why a new survey was ordered by the surveyor general's office as evidently Johnson's meander was found to contain numerous errors.

We cannot follow the learned trial judge in his deductions as to the Johnson meander line.

The judge a quo makes the statement in his opinion that it has been amply shown that no connection existed between Bayou Petit Anse and Lake Peigneur. It must be concluded that the judge refers exclusively to testimony as to recent conditions which, naturally, would have no direct bearing on conditions as they existed in 1812. The lower court's only reference to the testimony or exhibits as to conditions in former times is the Darby map, Exhibit P–37½, and excerpts from the Johnson and Boyd field notes. This court does not feel that the Kemper drainage district map, P–53, the Ludlow map, P–38, the Minor map, P–63, the Steinmayer map, P–81, and Exhibit P–116 which shows the location of the Senegues claim on a bayou leading out of Lake Peigneur, which bayou—by reason of the location of the property would have to be either the Lemaire Canal or bayou No. 1—can be totally disregarded. By reference to Exhibit P–50, it is noted that point 1 on the Boyd meander line is located approximately 1,300 feet from the lake on the Lemaire Canal and is at an elevation of between 6 and 7 feet. The Boyd meander line between points 1 and A crosses the Lemaire Canal approximately 1,300 feet from where this canal connects with the lake proper, and point A has an elevation of 5.58 feet. The Boyd line runs from point A to point 37 on the lake bank which has an elevation in excess of 6 feet, and the Boyd meander line runs from point 1 to point 2, which is also situated on the lake bank and which has an elevation in excess of 8 feet. At no other place in Boyd's meander of the lake does he retire so far from the lake bank itself to cross an inlet or outlet of the lake, from which we must conclude that, even in the year 1844, and

after an exceptionally dry season (P–75), there was considerably more water in the Lemaire Canal than appears there at the time this map, P–50, was made. John Rochel, engineer, testifying for the defendants, states that the Delcambre Canal and the Lemaire Coulee were the drainage outlets for Lake Peigneur prior to the construction of any artificial drainage in that territory. Further testifying he states that relying on his knowledge of the terrain and the maps admitted in the case, that the drainage area through Coulee Lemaire to Bayou Petit Anse was low enough to take water from the lake to Bayou Petit Anse, at any time the water in the lake was over about 4 feet mean gulf level. (Tr. Vol. 8, p. 1565.)

In view of the above evidence on this subject contained in the record, this court cannot agree with the judge a quo that there is ample evidence in the record to prove no definite connection between Lake Peigneur and Bayou Petit Anse in 1812, but, on the contrary, believes that ample proof has been made that such a connection did exist in 1812.

The lower court attempts, in its opinion, to discredit the estimony of Dr. Steinmayer in reference to the location, accumulation, and depth of peat deposits (Tr. Vol. 1, p. 111). The judge a quo seems to place principal reliance for the position he takes on Exhibit D–71 (Tr. Vol. 2, pp. 351, 352), which is an extract from a work of Joseph Le Conte entitled, "Elements of Geology." From the very title of the exhibit, it is apparent that

this is an elemental work in which no detailed discussion is attempted.

Dr. R. A. Steinmayer, from his own uncontradicted testimony, has been professor of geology at Tulane University in New Orleans for a period in excess of ten years, and is a member of the Association of Petroleum Geologists, a Fellow of the American Geographical Society, a member of the Louisiana Engineering Society, and a Reserve Captain of the Engineering Corps of the United States Army, and has been engaged as a consulting geologist by the Interstate Commerce Commission, United States Army Engineer, as well as oil companies and other business enterprises over a long period of years. Dr. Steinmayer testifies that he has resided in Louisiana for a period of ten years and has had occasion to study various lakes in the southern portion of the state, including Lake Pontchartrain, Lake Borgne, as well as Lake Peigneur and Sweet Lake. (Tr. Vol. 6, pp. 1071–1074 (P–77).

Dr. Steinmayer testifies to the rate of accumulation of peat and conditions under which it is formed in south Louisiana lakes from his own practical experience over a period of ten years' observation. This court does not find that his testimony has been contradicted by D–71, but rather confirmed, and a careful examination of the record will disclose that defendant did not produce a qualified witness to refute the testimony of Dr. Steinmayer in this case. The above is just as applicable to Dr. Steinmayer's testimony as regards wave-cuts in banks as it is to his testimony on other features of this case.

The judge a quo in his opinion devotes two paragraphs (Tr. Vol. 1, pp. 112 and 113) to the growth and age of trees as a rebuttal to testimony offered by the state as to the high-water mark of the lake. A review of this testimony indicates that the ring-count method for determining the age of trees is certainly not an exact science and that is particularly true in reference to hollow trees, which latter were the subject of considerable testimony in the record. The evidence is in complete conflict as to the existence of live oak and elm trees within high-water mark. The evidence does not conflict as to the existence of cypress trees within the high-water mark of the lake, but by reason of ample testimony, numerous exhibits, and practical observation, it is known that in Louisiana cypress trees do grow in water.

The voluminous record is silent on any direct testimony as to the mean high-water mark of the lake in 1812. A careful review of the testimony of the numerous witnesses produced by the plaintiff and the defendant, and a consideration of the still more numerous exhibits, this court cannot agree with the trial judge that the mean high-water mark of the lake stood at an elevation of 3 feet above mean gulf level, as the testimony in the record is certainly indicative of higher mean high-water mark in 1812.

There is no conflict in the testimony between plaintiff's and defendant's witnesses as to the effect that it is the tendency of all lakes—and especially the tendency of this lake—to obliterate itself (Tr. Vol. 8, pp. 1513, 1514; Vol. 6, pp. 1087, 1088.)

Testimony in the record shows conclusively that the water level of the lake fifty or sixty years ago, and even as late as 1922, before the erection of a dam, the lake was higher than it is today, and this testimony further indicates that the lake is constantly diminishing in size and in water level with the passing of time. (Tr. Vol. 8, pp, 1540–1556, testimony Rochel, defendant's engineer. Vol. 6, p. 979, testimony Harry Jacobs, state engineer. Vol. 6, pp. 1035–1043, Sagasta Boudreaux, state witness. Vol, 8, p. 1645, Jim Lachausse, defendant's witness. Vol. 6, pp. 1054, 1055, Laodis LeBlanc, state's witness. Vol. 9, p. 1799, Nicholas Broussard, state's witness. Vol. 9, p. 1785, Walter Y. Kemper, defendant's engineer. Vol. 6, pp. 1102, 1103, Prof. R. A. Steinmayer, state's geologist. Vol. 8, pp. 1638, 1639, Drozin Landry, defendant's witness.)

A glance at P–16—the aerial photographic survey of Lake Peigneur—indicates, even to one totally unfamiliar with engineering, that there has been a recession of the waters of the lake and that there is a well-defined bank around this lake which the present water level fails to reach.

The testimony offered by F. C. Gandolfo, Jr., registered surveyor for the defense, indicates that this old bank around the rim of the lake has an elevation of approximately 8 feet above mean gulf level (Tr. Vol. 7, p. 1390), and Dr. Steinmayer, testifying for the plaintiff, testifies that not more than 8 per cent. of the rim of the lake today is below an elevation of 7 feet above mean gulf level. This 8 per

cent. is entirely in the area of present inlets and outlets of the lake. (Tr. Vol. 9, pp. 1853, 1854, 1856.)

Although this court does not accept the Boyd meander line as the property line in this present controversy, yet it certainly feels that facts developed from a retracing of this line are persuasive as regards the determination of the mean high-water mark in 1812, and are indicative of the water line in 1844, when the Boyd meander line was run, except as to the water line on precipitous banks, where as a matter of convenience the surveyor located his points on top of the bluff, in some instances. The logical explanation of why certain points were located on the top or near the top of precipitous banks around the lake is that the water in the lake at the time the meander line was run was at a sufficient elevation to reach a point on these banks, so as to make the location of the point on the steep bank leading to the water's edge impracticable. It must be kept in mind that this survey was run during an exceptionally dry season (P–75), and further that the banks of this lake have been subject to an unusual amount of natural erosion resulting in the deposit of large amounts of silt in the bed of the lake, and causing considerable caving of the banks. The lowest elevation on the retracing of the Boyd meander line on this lake in 1932 (P–50) is at point 22 where the elevation is 5 feet above mean gulf. This point is presently located on a steep bank of the lake and the elevation immediately back of this point is shown to be 7 feet. Mr. LeBlanc, owner of 380 acres of land bordering on the

lake in this section, testifies that he has lived on the lake for twenty-six years, that his property was formerly marsh land because waters of the lake would overflow it, but that this land was high and dry now since the cleaning out of the bayou. The elevation of Mr. LeBlanc's property shown on this exhibit (P–50) is .7 feet above mean gulf today, and unquestionably the constant overflow of this section of the lake caused erosion of the banks, and consequent lowering of elevation since the time of the Boyd survey. (Tr. Vol. 6, pp. 1054, 1055). All other points shown on the retracing of the Boyd meander line on Exhibit P–50 with an elevation of less than 6 feet above mean gulf are located near or on outlets and inlets of the lake.

The Manual of Instructions for the Survey of Public Lands contains the following provision:

"All navigable bodies of water and important rivers and lakes are to be segregated from the public lands at mean high-water elevation. The traverse of a margin of a permanent natural body of water is termed a meander line." (Tr. Vol. 8, p. 1424.)

Although the above excerpt from the manual was read into the record by Mr. Gandolfo, surveyor for the defendant, under cross-examination, and it was further brought out that the first instructions in book form were put out in 1855, or after John Boyd ran his traverse of Lake Peigneur, however, this same testimony brings out the fact that previous instructions covering surveys were covered by manuscripts and printed circulars. It is notable that

the defendants have not attempted to prove that the instructions under which John Boyd operated in locating his meander line of Lake Peigneur were in anywise different from the instructions contained in the manual quoted above. (Tr. Vol. 8, pp. 1424, 1425.)

The record discloses substantial evidence to the effect that Lake Peigneur received a much larger volume of water prior to the installation of artificial drainage in this section and that the installation of this artificial drainage actually lowered the water level in the lake. (Tr. Vol. 9, pp. 1785, 1799; Vol. 6, pp. 1042, 1054, 1060; P-69.)

According to the United States Report of 1891, the lake and Bayou Carlin served a drainage area of over 200 square miles. (Tr. P-210, Vol. 2, p. 250; P-209.) The Minor map, Exhibit P-63, made in 1851, indicates a substantial flow of water into Lake Peigneur at the present intersection of the Lemaire Canal, as shown on Exhibit P-50.

Mr. J. Lyle Bayless, on direct examination, testified as follows:

"Q. Where was it?

"A. It is between 11 and 12 down under the large oak that is on the point. Round about No. 12, there was one or two large oak trees growing at the edge of the bluff that are now over in the lake, having been undermined by the waves. * * *" (Tr. Vol. 9, p. 1698.)

Mr. Bayless was testifying from Model P-74 which has identical points as indi-

cated on P-50. By reference to P-50, it is interesting to note that point 11 has an elevation today of in excess of 30 feet and point 12 has an elevation of approximately 15 feet. It is quite difficult to understand how the action of the waves would cause such extensive caving unless the water level of the lake extended up against this bluff bank.

Mr. Walter Y. Kemper, engineer appearing for the defendants, who testified that he had personal experience around Lake Peigneur extending over a period of years, and had supervision of the installation of a section of artificial drainage in the Petit Anse-Couteau drainage district, testified that, after a big rain, the whole territory would overflow and the country would be flooded for days and weeks. (Tr. Vol. 9, p. 1785; Vol. 8, pp. 1461, 1462). Further testifying, Mr. Kemper states:

"Q. What do you mean by the flood level when you were talking of Lake Peigneur?

"A. Lake Peigneur, before the canals were dredged into it, would rise greatly after continuous rains, and, when I indicated the mean low water level on this map, I meant the level that the lake had acquired since the drainage had been permitted to assume a normal level within a period of time.

"Q. When you speak of the flood stage after rains, you have reference to the usual heavy rains that would occur at a particular season of the year?

"A. Yes." (Tr. Vol. 8, p. 1463.)

Dr. Steinmayer, geologist testifying for the state, testifies that the water in the lake reached an elevation of 13.3 feet, and was at this elevation for sufficient periods of time to leave indelible wave wash markings on the precipitous banks of the lake. Dr. Steinmayer's testimony is supported by numerous exhibits and maps and this testimony was undoubtedly given after painstaking research and investigation. (Tr. Vol. 6, pp. 1102, 1103, 1108; Exhibits P-82, P-83, P-84, P-85, P-86, P-87, P-88, P-90, P-91, P-92, P-97, P-98, P-99.)

Mr. Waddill, engineer, appearing for the defendants, testifies that the low-water mark of the lake is 2 feet above mean gulf level. (Tr. Vol. 7, p. 1346.)

Mr. Rochel, engineer, testified for the defense:

"Q. You are of the opinion that the lake never had more water in it than today?

"A. It may have had a few more feet." (Tr. Vol. 8, p. 1564.)

It is to be noted that the water level referred to as the level of today was at an elevation of 3 feet above mean gulf. Mr. Rochel, further testifying, states that when the water level in the lake reached about 4 feet above mean gulf level, the drainage area through Coulee Lemaire to Bayou Petit Anse was low enough to take water from the lake to Bayou Petit Anse. (Tr. Vol. 8, p. 1565.)

Conflicts in testimony between engineers and the geologist appearing for the state and engineers appearing for defendants re-

sult from the fact that defendant's engineers focused their attention on present conditions in the lake and surrounding territory (Tr. Vol. 7, p. 1328; Vol. 8, p. 1471; Vol. 8, pp. 1558, 1559), and the state's engineers and geologist, while utilizing facts determined from present conditions, attempted to arrive through recognized scientific processes, at conditions as they existed in 1812. The conflict in connection with elevations is well explained in the testimony of Dr. R. A. Steinmayer, as follows:

"Q. What is your opinion regarding the different datum which was used by the engineers for the Defense?

"A. In substance, Mr. Kemper's datum was mean low water level of the lake. When the flood waters were drained out, and later he contradicts himself and states that the water level was established independently of the level of the water in the lake at the time he established it. Mr. Waddill said that these levels do not reach to mean lake level. It is an arbitrary system of contours, and then later on he states, by adding one foot he arrives at Mr. Ricketts' contour. Mr. Rochel used mean gulf level as his datum, and, yet, when he determines the elevation of the top of the Jefferson Island hill, he gets an elevation of 75 feet, whereas, when I use the same datum I get an elevation of 83 and a fraction feet. In other words, each man has established his own datum, and, personally, I can't see how they can qualify their material when they are all working from a different datum plane." (Tr. Vol. 9, pp. 1867, 1868.)

█ It is apparent, therefore, from a review of the testimony for both the state and defense that the mean high-water mark of Lake Peigneur in 1812 at the time the state of Louisiana was admitted to the Union must be determined from a consideration of a maximum watermark of 13.3 feet and a low watermark of 2 feet above mean gulf level. This court feels that this record conclusively indicates a mean high-water mark of 6 feet above mean gulf level, as clearly indicated by the elevations on the retracing of the John Boyd survey in 1932, excepting those elevations apparently taken on or near the tops of precipitous banks, and that the establishment of this contour of 6 feet above mean gulf will do substantial justice to all parties at interest.

█ The next question to be determined by this court is whether or not a trespass has been committed by defendant, and, if any committed, the extent thereof.

The trial judge concluded, after a review of the exhibits and testimony, that the defendant does not deny that mining operations were carried on beyond the 3-foot contour line, stating further that their own exhibits correspond to the state's exhibits as to the extent of these mining operations with a negligible discrepancy. (Tr. Vol. 1, p. 115.)

Exhibits D–3, D–44, P–51, P–122, P–123, P–128, and P–129, together with the testimony in the record, show unquestionably that a trespass was committed by the defendant herein on the state's property and that salt was removed therefrom.

By reference to Exhibit P–51, it will be noted that the 6-foot water level contour line is depicted thereon. The area of trespass in this section is indicated on Exhibit P–51 by the red pencil figures of R–1 and R–2. The 6-foot contour line on Exhibits D–2 and D–3 is not shown in the areas of trespass, but is shown on other portions of these maps. By reference to Exhibits D–2 and D–3, a small area of trespass is indicated between points B–7 and B–6 on the retracing of the Boyd meander line on these maps which correspond to points 12 and 13 on Exhibits P–50 and P–51. The water elevation in this area of trespass has been determined at a contour line 6 feet above mean gulf level. Although the 6-foot contour line is not depicted, the 5-foot contour line is shown on Exhibits D–2 and D–3, and it is obvious from the defendant's own exhibits that a trespass has been committed in this section of the lake even below the 5-foot contour line.

The areas mentioned above constitute the entire areas of trespass involved in this suit.

We must next determine the quantity of salt removed from the area trespassed upon by the defendant.

There seems to be no disagreement between the engineers for both litigants as regards the amounts of salt removed within the contours shown at various elevations on D–2, D–3, and P–51, and as further explained by Exhibits P–122, P–123, P–128, and P–129.

Plaintiff, in its brief, p. 148, has prepared a convenient table, which has been

compiled from Exhibits P–51, P–122, P–123, P–128, and P–129, to which no objection has been voiced by counsel for defendant. After determining the mean high-water mark of the lake at the 6-foot above gulf level and by reference to this table, the court hereby determines that the amount of salt mined by the defendant herein in the area trespassed upon, indicated as R–1 and R–2 in red pencil on Exhibit P–51, between points 7, 8, and 9 on the Boyd meander line, shown on this map, to be 193,265.9 tons, and the court also determines the amount of salt mined in trespassing on the state's property between points B–7 and B–6 on Exhibit D–3, which corresponds to points 12 and 15 on Exhibits P–50 and P–51, to be 19,959.1 tons, or a total of 213,225 tons in both areas of trespass.

By reason of the fact that the question of good or bad faith on the part of the defendants in committing a trespass on the state's property in removing valuable minerals therefrom is of vital importance in arriving at the amount of damages, we will treat this subject at length.

Lake Peigneur has been leased on numerous occasions by the state of Louisiana. Beginning in 1914, it was leased to the Orange Island Development Company. (P–31.)

In 1916, it was leased to Mr. Ventress J. Smith, who was of counsel for the defendants. (P–30.) This particular lease to Mr. Smith describes the lake as consisting of 1,737.62 acres, and further describing the property states "all as will more fully appear on the map or plat and field notes attached hereto and made part hereof, its boundary being the traverse line of such lake as shown on said map and by said field notes."

Mr. Karl Campbell, on direct examination by Mr. Walet, after testifying to the fact that he had been in the state land office for thirteen years, testified as follows:

"Q. What plat and filed notes and survey is recognized by your office as the official survey of Township 12 South, Range 5 East?

"A. The John Boyd surveys are recognized by our office as being the field notes and have been as long as I can remember." (Tr. Vol. 5, pp. 766, 767.)

It is unquestionable that the plat and field notes referred to in the lease refer to the John Boyd field notes and a plat prepared therefrom.

The next lease in the record is by the state to Mr. C. J. Webre (P–29) which was entered into March 12, 1919, and which describes the lake as containing the identical number of acres contained in the lease to Mr. Ventress J. Smith, and it is quite clear from the testimony that Mr. Webre was acting in behalf of the Jefferson Island Salt Mining Company, Inc., in his negotiating for and obtaining this mineral lease on Lake Peigneur. (Tr. Vol. 2, p. 211; P–105; Vol. 2, p. 207; Vol. 5, pp. 714, 717; P–14; P–13; Vol. 2, pp. 168, 169; P–3; Vol. 2, p. 159; P–44; Vol. 2, p. 176.)

The acreage of the said lake was determined by the Boyd meander line. Mr.

Webre, in his deposition, states that a survey was made at the request of J. Lyle Bayless and Warner Jones, and that he obtained the field notes from the land office at Baton Rouge, La., and had Mr. Taylor, an engineer employed in sinking a shaft for the Jefferson Island Salt Mining Company, Inc., run a line on the property and make a plat thereof, which was the Boyd meander line referred to. (Tr. Vol. 2, pp. 213–215; 200–203.) Mr. Webre had this line run for his guidance in drilling wells on the property of the state in conformity with the provisions of the lease from the state. (Tr. Vol. 2, p. 216; Vol. 9, p. 1699; Vol. 5, p. 715; Vol. 5, p. 713.)

All of the leases mentioned above were entered into in conformity with Act No. 258 of 1912 and Act No. 30 of the Extra Session of 1915 and were advertised in conformity with these acts in Iberia and Baton Rouge parishes (Tr. Vol. 5, p. 765), and filed in the state land office.

It is unquestionable that the Jefferson Island Salt Mining Company, Inc., through its then agent, Mr. Webre, who acted under instructions of Mr. Warner Jones and Mr. J. L. Bayless, who has always been an officer, director, and stockholder of the defendant corporation and who is now its president, was acquainted with the boundary line to the property claimed by the state and recognized such as the line by the drilling operations carried on in order to perpetuate the said mineral lease.

In the testimony of Mr. Bayless, he has made repeated statements that he has always considered Lake Peigneur the property of the state of Louisiana and that he was informed by Mr. Webre that the lake was the property of the state of Louisiana. (Tr. Vol. 9, p. 1699; Vol. 5, p. 716.)

The Jefferson Island Salt Mining Company recognized the state's ownership of the lake on numerous occasions in connection with correspondence of their agents and attorneys with various public officials of the state and the United States. (Ex. P–4, P–5; P–15; P–42; P–46; Tr. Vol. 2, pp. 171, 172, 173, 174, 175, 176, 178.)

We quote from the transcript, testimony of Mr. Bayless, Volume 7, pages 1220 and 1221, as follows:

"Q. You understood the property belonged to the State. Make a statement as to the full understanding. There have been a whole lot of letters offered here. What was in your mind?

"A. Mr. Webre told me the high-water mark was the meander line, and all salt inside of that high-water line was the lake. He told me that it was necessary for us to hold the lease which he had obtained for us in his name, and that we would have to commence drilling within a certain period of time. We got a dry-land drilling rig and put well #1 approximately seventy-five feet from the water's edge on our land. As soon as we drilled this well, we wired the State—Mr. Webre wired the State—I am not sure whether he wired in his name or in our name. I think it was his name. He did this to carry out the contract by which we had to start this drilling to hold the lease.

"Q. At the time of your dealing—either thru Mr. Webre or anybody else—about the lake, did you know anything about the question of ownership of the lake?

"A. We understood it belonged to the State." We quote from Mr. Bayless' testimony: (Tr. Vol. 9, p. 1722)

"Q. Mr. Bayless, as a matter of fact, didn't you and your company know exactly when you crossed that Boyd meander line in severing salt beneath the lake?

"A. We did not. And as soon as we were notified of the Boyd meander line, Mr. Burke had Mr. Gordy stop severing salt. It was a small lot of salt, and we quit mining on that part of the mine and moved over to the far side."

It is apparent from the foregoing that Mr. Burke, attorney for Mr. Bayless, instructed Mr. Gordy to stop severing salt under the property the state claimed as soon as the Jefferson Island Salt Mining Company, Inc., were notified that their underground mining operations had extended beyond the Boyd meander line.

However, it appears from the record that Mr. Walter Gordy, in charge of underground operations at the mine, did not abide by these important instructions from Mr. Burke as he testified as follows (Tr. Vol. 8, p. 1591):

"Q. Are there any other changes that you make in regard to your underground workings recently? Or within the last two or three years?

"A. You mean radical changes?

"Q. Well, the method of making your undercuttings, or the method of the direc-tions in which you were making your undercuttings?

"A. Direction, no. We changed the method of mining."

Mr. Bayless' further testimony is that only a small lot of salt had been removed. From the record and Exhibits P–51, P–122, P–123, P–128, and P–129 it appears that there is no appreciable contention between Mr. Ricketts, engineer for the state, and Mr. Kemper, engineer for the defendant company, that a total quantity of salt aggregating 645,658 tons was extracted by the salt mining company beyond the Boyd meander line and under property claimed by the state.

A supplemental petition was filed by the state alleging that salt had been removed in the disputed area after the original suit was filed by the state in September, 1931.

Testimony in support of the state's supplemental petition was offered through Mr. Ricketts, engineer, who testified to the effect that 131,163 tons of salt had been removed from the area in dispute between June 14, 1931, and December 10, 1931. (Tr. Vol. 7, pp. 1190, 1191, 1193.) Mr. Ricketts further prepared a sketch from his investigations, which was introduced into evidence by the state as Exhibit P–128. The original petition of the state was filed September 25, 1935. Referring to P–128, it will be noted that salt was mined during the above-mentioned period in sections C, E, F, and I. By reference to P–51, it will be noted that the above sections, with the exception of section C, are within the area marked in red pencil on this exhibit as R–1 and R–2, which was

the identical area in which the lower court found a trespass had been committed even at the 3 feet above mean gulf level contour established by the lower court. The establishment of the 6 feet above mean gulf level contour by this court will include a portion of section C, as well as sections E, F, and I.

Defendant did not introduce testimony to refute Mr. Ricketts' testimony, but Mr. J. C. Gordy, manager · for defendant, on cross-examination (Tr. Vol. 9, p. 1679), testifies as follows:

"Q. Didn't you do mining in this direction after suit was filed?

"A. I think there was some salt removed."

Mr. Walter H. Gordy, superintendent of underground workings at the mine, on cross-examination (Tr. Vol. 8, p. 1589) states that Mr. Bayless, president of the salt mining company, and Mr. J. C. Gordy, manager, always had full knowledge of the underground cuttings by reason of reports made to them by him.

Apparently, from the record, not only were mining operations carried on under property claimed by the state prior to the filing of this suit and after Mr. Burke, counsel for the defendant company, warned this company, but these mining operations were carried on even after the original suit had been filed.

The Jefferson Island Salt Mining Company, Inc., has offered in evidence Exhibits D-45 and D-72 which are designated "Topographical Map of Jefferson Island" and are dated November, 1922, prepared by John Rochel, civil engineer, who testified for defendant, and were introduced as evidence of good faith by the defendant in mining salt on the property owned by the state of Louisiana in Lake Peigneur. It is notable that these maps are devoid of any property lines, and Mr. Rochel's testimony in connection with these maps is interesting:

"Q. As a matter of fact, do you know where your starting points were?

"A. I had none.

"Q. What did you attempt to depict on this map?

"A. I attempted to depict the location of the buildings and roads and structures of all kinds as well as the slopes of the hill by the contours shown.

"Q. Then that map is nothing more than a picture map?

"A. That is all it is." (Tr. Vol. 8, p. 1555.)

The state placed Mr. Ricketts on the stand and questioned him in reference to these maps as follows:

"Q. Is it customary, Mr. Ricketts, among engineers to establish property lines with contour maps?

"A. Heavens, no. The contour map is merely to anchor up the physical features. I never heard of that used for property lines. You have to have lines and angles. How can a man do that? It is physically impossible to do that." (Tr. Vol. 9, p. 1842.)

Mr. Ricketts was not cross-examined by defendant's counsel after making these

statements, which would seem to indicate that the testimony given could not be refuted.

In view of this testimony, the court must conclude that the utilization of such a map by the defendant in an effort to establish property lines between their property and that of the state could have very little weight in contending good faith.

By reference to Exhibit D–45, it is to be noted that well No. 1, which was drilled on the state's property in conformity with the lease obtained on the bed of the lake by the Jefferson Island Salt Mining Company, Inc., through Mr. Webre, was drilled 75 or 100 feet from the water's edge between the water line shown on this map and the bluff bank. (Tr. Vol. 9, p. 1699.) There is no evidence in the record to indicate that the Jefferson Island Salt Mining Company, Inc., or Mr. Bayless had any change of mind as to whether or not the state owned the bed of Lake Peigneur between 1919, the approximate date of the drilling of the well, and 1922, the date of the making of this map, and it is, therefore, a little difficult to understand how they would get the impression between these dates that their property line had extended 75 to 100 feet out in the lake.

The defendant is beset with still more difficulty, however, in attempting to establish its good faith by the contour line developed by Mr. Rochel on D–45. It is perfectly plain from an examination of D–2 and D–3 that the defendant committed a trespass on the state's property even after the establishment of this arbitrary contour line in a manner not suited to the

purpose. By reference to Exhibits D–2 and D–3, it will be noted that this arbitrary Rochel line has been traced on both of these maps. At a point in the lake marked X–2 in pencil on these maps, it will be noted where the mining company trespassed on the state's property beyond this line.

As far back as 1925, apparently, the Jefferson Island Salt Mining Company, Inc., realized the possibility of encroaching on the state's property in carrying on their salt mining operations. On October 20, 1925, a certain lease was entered into between Jefferson Island Salt Mining Company, Inc., represented by J. L. Bayless, V. P., and United Oil & Gas Syndicate, Inc., represented by M. Russell. (Tr. Vol. 4, pp. 697–703; D–155.) This lease contains certain provisions which stand out in relation to subsequent events. The property described in the lease is described in its relation to Lake Peigneur, as follows:

1. "Bounded north by Lake Peigneur."

2. "And West by Lake Peigneur."

3. "Touching Lake Peigneur."

This lease, in so far as the description of property leased is concerned, certainly does not indicate any claim to the bed of Lake Peigneur.

However, there are certain other provisions of this lease which prove very interesting, as follows (Tr. Vol. 4, pp. 698, 699):

"5th. As part consideration to the Lessor for the making of this lease, the Lessee agrees that in the event it drills a well *in Lake Peigneur*, irrespective of the dis-

tance from Lessor's property, and drills into a salt dome or body that *is a continuation of the Lessor's dome or body,* it hereby gives to said Lessor the option of purchasing the Lessee's rights in said salt dome or body for Ten Thousand Dollars ($10,000.00). Said option must, however, be exercised by the Lessor within twenty-four (24) months from the time that Lessee notifies the Lessor of such discovery. The said Lessee represents that it now has a contract with the State of Louisiana under which it acquires seven-eighths ownership in any minerals so discovered, including salt, and that this is the interest that will be sold in the event the above option is exercised." (Italics ours.)

"No well shall be drilled nearer than two hundred (200) feet to any house or barn on the said premises, nor within one thousand (1000) feet of the Lessor's proven salt area, whether the Lessee is drilling on the Lessor's property, or on any other property that the Lessee may lease, without a written consent of the Lessor." (Tr. Vol. 4, p. 700.)

"The Lessee shall stop drilling in case it strikes salt at any depth, unless the Lessor gives the Lessee permission in writing to continue drilling in salt, and if such permission is given, then the Lessor shall have the privilege of revoking such permission and of stopping Lessee from drilling in salt at any time the Lessor may see fit." (Tr. Vol. 4, pp. 700, 701.)

"The Lessee hereby agrees not to drill in the Lake within one thousand (1000) feet of the Lessor's proven salt area on his property, even though the Lessee should give up its lease on the Lessor's property, and the Lessee further agrees not to drill at any point within one thousand (1000) feet of the Lessor's proven salt area, as shown on a map in the office of the Lessor, and to furnish copy of said map to Lessee when this lease is delivered." (Tr. Vol. 4, p. 701.)

The testimony of Mr. Bayless in connection with the provisions of this lease to the United Oil & Gas Syndicate and their successors is interesting. We quote from Transcript Vol. 7, page 1221:

"Q. When was it the question came up as to the doubt in your mind whether it belonged to the State or not?

"A. Well, about four or five years ago. We had a contract with the United Oil and Gas Syndicate and their successors— I think the Jefferson Lake Oil Company— to drill on our property. We gave them the privilege of drilling on there without any charge or rental for the land. As a further consideration for our letting them drill on our property without any charge or rental, they gave us an option of any minerals including salt that they found under the lake, provided it was a continuation of our dome or body. This option was to be exercised within two years after the Jefferson Lake Oil Company located any minerals including salt. They didn't notify us, but we heard that they had struck some minerals under the lake. And within the prescribed time, we exercised this option, by tendering them Ten Thousand Dollars in currency, thru Mr. Walter Burke and Mr. Gordy. They refused to accept this money. Then, upon the ad-

vice of Counsel, we started looking into the title to the lake, and, after examining the title, it seemed evident that the lake belonged to the adjacent property owners instead of the State."

In connection with this same subject, and in general reference to a letter written by Mr. Bayless to the Jefferson Lake Oil Company (P–147, Tr. Vol. 2, p. 248), assignees of the original lease to the United Gas & Oil Syndicate, Inc., by the Jefferson Island Salt Mining Company, Inc., we quote from the Transcript, Vol. 9, p. 1725, the testimony of Mr. Bayless:

"Q. You recall just about the same time, 1929, when, according to figures to the State on severance tax, and on actual excavation, and about the same time you formed the selling company, you recall you wrote a letter to the Jefferson Lake Oil Company and asked them to drill a little closer to the mine property, you would tell them in about 12 or 15 months why you wanted them to do that?

"A. No. I couldn't tell definitely why. As I recall, I got a letter from Mr. Abshire about that time. There was a clause in our option that had reference to the continuation of our dome or body. Before we had our option, and I might be incorrect, but I am sure, in fact, that Mr. Abshire either told me or wrote me that the salt stops right off the edge of our property, and then started again. In other words it was not a continuation of our dome. I knew definitely his statement was incorrect. I had a way of knowing it. One reason, he was trying to get them to drill there to show that the dome was falling off from our property to the first well where they struck sulphur or salt."

"Q. How did you know that?

"A. I had in my possession a geophysical map (a copy of it). In fact, I am sure that Mr. Abshire or Mr. Moses Russell had showed me this map a number of times—showing the contour of the dome, and it was very inaccurate."

Mr. Bayless seeks to give the impression by the foregoing testimony that some four or five years previous to the date this suit was filed Mr. Walter Burke, counsel, advised examining the title of the property and from this examination it was determined that the lake belonged to the adjacent property owners instead of the state. By reference to Exhibit P–4 and particularly to a photostat of a copy of a letter bearing date of April 7, 1931, addressed to Major R. F. Fowler by Mr. Walter J. Burke, it is noted that as late as 1931, apparently Mr. Burke did not question the state's ownership of Lake Peigneur. The following paragraph is quoted from this letter:

"The State as owner of a portion of the salt mine underlying the Lake, and also interested because of its royalty in the development of the sulphur and oil, which appear to have been definitely located within the confines of the Lake, has an interest with that of the Jefferson Island Salt Mining Company and other industries in this project."

Mr. Bayless contradicts his testimony as to the time at which he decided the bed of Lake Peigneur did not belong to the

state. He testifies as follows (Tr. Vol. 9, pp. 1717, 1718):

"Q. Mr. Bayless, you stated in your testimony that you were under the impression the State owned Lake Peigneur. Just when did you change your mind?

"A. After this suit was instituted, at the suggestion of my Counsel, we looked into this matter very thoroughly. And then after looking into it our attorneys decided we owned the riparian rights."

It is to be noted from the testimony quoted above that Mr. Bayless testifies at first that he doubted the state's title to Lake Peigneur after the Jefferson Lake Oil Company refused to permit him to exercise an option to purchase salt mining rights under the lake held by the oil company by reason of a mineral lease entered into with the state of Louisiana. This testimony is not borne out, however, by Mr. Burke, his attorney.

Secondly, Mr. Bayless testifies that he did not reach the conclusion that Lake Peigneur did not belong to the state of Louisiana until after this suit was filed. It seems apparent from the foregoing that the Jefferson Island Salt Mining Company, Inc., and Messrs. Bayless and Jones are quite prone to attacking titles whenever a business transaction cannot be consummated to their satisfaction.

It would seem from the foregoing testimony that the defendant had no other alternative, in view of the fact that it had deliberately mined salt under the property which was claimed by the state than to contest the state's title to the property on which the trespass had been committed.

The above-quoted testimony is also interesting by reason of the fact that Mr. Bayless exhibits such positive knowledge that the salt dome in Lake Peigneur is a continuation of the salt dome beginning on his property and refers to a certain map as giving him certain information in reference to this dome.

Subsequent testimony to that above quoted shows that Mr. Bayless contradicts himself in reference to this map and in the final analysis the map is not introduced in the case. It is not illogical to infer that Mr. Bayless gained his positive knowledge that this salt dome continued on out into Lake Peigneur from his property, by reason of actual mining operations carried on in the salt dome under the land claimed by the state.

The topography and elevation of the banks of Lake Peigneur between points 7 to 15 on Exhibit P–50 have been definitely disturbed by the leveling down of the hill located on Jefferson Island. Mr. C. J. Webre, who was general manager of the Jefferson Island Salt Mining Company in the early stages of development, testified that this hill was cut down 25 or 30 feet and the earth was washed over the precipitous bank into the lake. (P–105; Tr. Vol. 2, p. 218). This testimony is supported by numerous witnesses who have testified that this hill was cut and washed down and a large amount of the dirt went over the banks into the lake. (Lassalle, Tr. Vol. 6, pp. 1017–1019; Abshire, Vol. 6, p. 1158; Bonin, Vol. 6, p. 1044; Valls, Vol. 6, pp. 965, 966, 973, 974, 975.) A study of contours was made by Mr. Ricketts, engineer for the state, which indicates

artificial filling in the cove and on the north side. (Tr. Vol. 5, pp. 847, 848, 849, 880, 881; Exhibit P-65.)

Exhibits P-69, P-70, and P-71, which are in the nature of historical data, indicate that the banks of this section of the lake were more precipitous than they appear today. Mr. Harry Jacobs, chief of the state board of engineers, testifies from personal observation twenty years ago, as follows:

"A. As I recall, the bluffest bank known "are" between the points opposite 8, 9 and 10. The bank is sort of—could be classed as a bluff bank around 12." (Tr. Vol. 6, p. 983.)

Mr. Jacobs further testifies that the banks on the north side in the vicinity of meander points Nos. 8 and 9 were decidedly steeper at this same period, and bore no evidence of the filling in and washing process which was subsequently carried on by the salt mining company. (Tr. Vol. 6, pp. 986, 977, 978, 979, 982, 983.) This testimony of Mr. Jacobs is confirmed by Mr. Webre, former general manager of the mining company, and Mr. W. L. Taylor, who was in charge of sinking the original shaft on Jefferson Island. (P-105, Tr. Vol. 2, p. 207; Exhibit P-104, Tr. Vol. 2, p. 199.) Mr. J. C. Gordy, manager of the Jefferson Island Salt Mining Company, admits that this leveling of the hill and the washing of the hill did take place and that bulkheads were placed in the vicinity of points 8 and 9 in an attempt to retain this earth which was washed from the top of the hill. (Tr. Vol. 9, p. 1670.) The condition of this section of the bank in 1932 is well indicated by aerial photographs bearing Exhibit Nos. P-16, P-18, and P-21, and indicate clearly that a section of bank projecting out into the lake has been artificially produced by the leveling of the hill and the washing of certain refuse salt into the lake a portion of which has accumulated on the bank itself. Professor Steinmayer has clearly demonstrated, by careful examination of soil and peat deposits, that the bed or bottom of the lake has extended back a considerable distance from where we find the bank of the lake today between points 8, 9, and 10, which banks have been produced artificially. (Exhibits P-98 and P-99.) A careful consideration of P-98—a map prepared by Dr. Steinmayer after extensive boring and research—shows the condition of the banks of the lake between points 8 and 9 and a section between points 9 and 10. A consideration of Exhibits P-51, P-61, P-65, P-122, P-123, P-129, and a comparison therewith with the aerial photographs P-16, P-18, and P-21 convinces this court that the 6 feet above mean gulf level water line established in the lake does not conform by reason of the artificial filling in of the lake between points 8, 9, and 10, with the condition of these banks as they existed in 1812.

By reference to Exhibit P-51, it is noted that possibly the largest area of trespass is located below this section of bank built out into the lake through artificial means by the defendant herein.

The necessity for the organization of a second company owned and controlled by Messrs. Bayless and Jones, and called the

Jefferson Island Salt Company, Inc., incorporated under the laws of Kentucky in 1929, has not been satisfactorily explained in the record. This is especially true when it is taken into consideration that this company was organized for the exclusive purpose of selling salt mined by the Jefferson Island Salt Mining Company, Inc., also owned and controlled by Messrs. Bayless and Jones, and was organized at about the time the mining company began its trespass on property claimed by the state of Louisiana. Furthermore, the record indicates that after the formation of the second company, a relationship was established whereby sales were made by the mining company to the selling company at prices substantially under the market quotations and the selling company, to all intents and purposes, took over the finances of the mining company merely furnishing them enough money to cover the expense of actual operation and settling up the difference due the mining company on the books of the selling company as a debt due the mining company. (Tr. Vol. 9, pp. 1728–1752.)

This court, in view of the evidence reviewed, comes to the conclusion that the trespass by the defendant herein was committed and carried on in bad faith, and was willful.

We finally come to the consideration of the amount of damages, and a question of law as to the nature of defendant's and interveners' liability.

This court finds the defendant's contentions that the value of the salt in place should be the basis of affixing damages, as well as the alternative pleading that the measure of damages should be the sale price after all deductions for expense incurred, including the cost of sinking the shaft, without merit, since it has been determined the trespass was willfully committed in bad faith.

It is well settled in timber cases in this state that where a trespasser is guilty of bad faith or has committed a willful trespass, he is liable for the value of the logs or timber, if the logs have been manufactured into lumber, *without any allowances or deductions for costs or expenses.*

"Trespasser removing timber in bad faith must pay damages measured by value of timber in manufactured state without deducting manufacturing costs." Nona Mills Co. v. W. W. Gary Lumber Co. (La. App.) 127 So. 425, 426; Rusca v. Boulet (La. App.) 142 So. 319.

"The damages recoverable from a trespasser for cutting and removing timber is fixed at the amount for which it was sold by the trespasser, but where the trespasser was guilty only of legal bad faith, the expenses incurred by him may be deducted, while in the case of moral bad faith they may not be deducted." Allen v. Frank Janes Co., 142 La. 1056, 78 So. 115.

"The measure of damages as compensation for a trespass on mining property is ordinarily governed by the usual values relating to damages, particularly those that apply in cases of trespass generally, so far as they are applicable to the facts of the particular case, such as whether the *trespass was innocent or wilful.*" (Italics ours.) 40 C. J. 916, § 466.

"The measure of damages for the reckless, willful, or intentional taking of ore or timber from the land of another without right *is the enhanced value of the ore or timber* when it is finally converted to the use of the trespasser, without allowance to him for the labor bestowed or expense incurred in removing and preparing it for market." (Italics ours.) Silver King Coalition Mines Co. v. Silver King Consolidated Co., 204 F. 166, 178, 122 C. C. A. 402, Ann. Cas. 1918B, 571, citing E. E. Bolles Wooden-Ware Co. v. U. S., 106 U. S. 432, 434, 1 S. Ct. 398, 27 L. Ed. 230.

"The measure of damages for a willful subterranean trespass upon mineral lands is the value of the thing mined, after its severance, without deduction of expenses incurred in mining and removing it." Petrelli v. West Virginia-Pittsburgh Coal Co., 86 W. Va. 607, 104 S. E. 103.

In its opinion, the court said: "In this day of accurate civil engineering and skilled mine organization and management there is but little, if any, excuse for trespass beyond the boundaries within which mining lawfully may be done."

"Where a willful trespasser extracts mineral from lands, the owner is entitled to recover, in suit for accounting, the value of the mineral extracted, without deducting *any expenses incurred in mining it.*" (Italics ours.) New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S. W. 245.

"Where coal is taken from another's land, and the trespass is willful, and not the result of an honest mistake, the measure of damages is the *value of the coal mined at the time and place of its severance,* without deducting the expense of severing it." (Italics ours.) North Jellico Coal Co. v. Helton, 187 Ky. 394, 219 S. W. 185.

"Landowner's measure of damages for negligent mining of coal from under his land is the value of the coal when severed and at the mouth of the mine." Mt. Savage George's Creek Coal Co. v. Monahan, 132 Md. 654, 104 A. 480.

See, also, Stroud v. Guffey (Tex. Civ. App.) 3 S.W.(2d) 592; Thompson v. Dentzell, 232 Ky. 755, 24 S.W.(2d) 607; McGraw v. Berry, 170 Ark. 426, 280 S. W. 383; Brady v. Stafford, 115 Ohio St. 67, 152 N. E. 188, 189.

We are not impressed with the method utilized by the lower court in arriving at the value of salt per ton, incidental to the assessment of damages.

The state has introduced into evidence Exhibits P-6, P-7, P-8, P-9, P-10, P-11, P-12 (Tr. Vol. 2, pp. 161–167), which are invoices of the Jefferson Island Salt Mining Company, Inc., for salt sold. Mr. Bayless' testimony in reference to P-6 of these invoices is interesting (Tr. Vol. 5, p. 743):

"Q. How much is that a ton for that invoice?

"A. $10.70. That figures in the neighborhood of $2.00 for freight and $2.80 for the bags and $3.00 for the salt."

The face of the invoice shows the freight rate to be $1.94½ per ton, and simple subtraction shows plainly, even tak-

ing Mr. Bayless' figure of $2.80 for the bags as correct, that the price of salt at the mine was $5.95½ per ton. Following Mr. Bayless' testimony on these invoices (Tr. Vol. 5, pp. 743–746), it is noted that a portion of the salt sold was at the rate of $11.70 per ton (P–10). Mr. Bayless attempts to explain this increase in price by reason of difference in packing of the salt (Tr. Vol. 5, p. 745), but by reference to P–6 and P–10 it is noted that both shipments were packed in 200-lb. jute bags, and the actual reason for the difference in the price was that P–6 covered "C" salt and P–10 "A" salt. It is apparent that the price for the salt at the mine in connection with invoice P–10 was $6.95½ per ton.

The question of the cost and sale price of bags and containers is the subject of considerable testimony and appears on several statements including P–141. After swearing to the correctness of the statement, Mr. Bayless admits an error of $248,553, but further explains that he was not a bookkeeper and had not checked up the correctness of the figures. (Tr. Vol. 9, pp. 1743–1747.)

The price allotted to bags and containers on the various invoices introduced in the case both by the defendant and state is interesting from the viewpoint of Mr. Bayless' testimony (Tr. Vol. 9, p. 1731–1738), especially in view of the fact that the profit on bags was shown to be 66 per cent. for the year 1931. This testimony discloses the fact that the price allotted to bags and containers on the invoices was purely an arbitrary one, subject to revision at any time by defendant, and in no wise representing the costs of the bags and containers to the salt company.

This court is interested in determining the value per ton of the salt at the mouth of the mine during the period of trespass, and finds no better evidence of the proper value to attach than Mr. Bayless' own testimony (Vol. 9, p. 1742):

"Q. And you would not make any differentiation between what the amount the bags cost and what the salt cost?

"A. No. If in bulk, I would give the price of $6.00. If the same salt in 200 lb. bags, I would say the price was $2.80 higher, or $8.80. That is the present list market price in Louisiana today."

Mr. Bayless has also testified to the effect that by reason of competitive conditions and the general depression that the salt industry in 1932, the time this testimony was given, was at a low ebb, and consequently we feel no hesitation in accepting his quotation of $6 per ton, as being representative of the price level in 1929, 1930, and 1931, the approximate period of trespass.

In connection with the adoption of the $6 per ton price, the court finds, however, considerable evidence in the record confirming this price. Mr. J. J. Manson, of Manson Bros., New Orleans, La., who has been in the salt business for over fifty years, and has bought salt from the Jefferson Island Salt Mining Company for the last ten years, in his deposition testifies to the purchasing of coarse and fine salt in 200-lb. bags at prices identical with

those indicated on P–6 and P–10, previously discussed, during the years 1929, 1930, and 1931. Mr. Manson further testifies that the prices he paid for salt were the market prices. (P–106; Tr. Vol. 2, pp. 229–236.)

Mr. Bayless' testimony in reference to Exhibit D–1 as regards the per cent. of loss in mining salt is interesting (Tr. Vol. 9, p. 1710):

"Q. Mr. Bayless, going back to this document D–1, I observe in the last column here a 'percent loss, 16.7'. What do you mean by this percent loss?

"A. That is the pile of salt on the edge of the lake spoken of as refuse salt. There is always a big loss in getting the salt out of the mine. We get it dirty in handling it, and by bad screening; and this was by shipment.

"Q. Is that salt commercial in any manner?

"A. No sir. That is the reason we dump it, and it is not shown in our severance tax. And you will find that each of the mines, and all of the mines in the country, and in places where there is rock salt plants, they have refuse salt deposits."

In connection with P–145 (Tr. Vol. 2, pp. 243, 244), a contract between the Gulf Refining Company and the Jefferson Island Salt Mining Company, Mr. Bayless testified as follows:

"Q. I will identify that one as P–145. Now, Mr. Bayless, this contract calls for

a delivery to the Gulf Refining Company of refuse salt?

"A. Yes. It calls for refuse salt, but, on account of the quality of the refuse salt we have to give them what we know as our surplus grades. This means any coarse grade we have too much of, we will give it to them, but we cannot ship them this fine refuse salt on account of it becoming hard and causing them considerable trouble to unload. It is an understanding with them on account of trade conditions that we would give them surplus grades. Our new contract with them reads exactly the same way, except the price is $2.00 per ton instead of three." (Tr. Vol. 9, p. 1714.)

Further testifying, Mr. Bayless states:

"Q. Now, that refuse is the very lowest grade of salt that you have. Isn't it?

"A. No, Sir. Well, yes, it is the lowest grade of salt we have. When we first started selling the Gulf Refining Company, they accepted this low grade. We even shipped salt that had oil in it, and they accepted it. Later on, our competitors shipped them salt, and gave them a better grade. This forced us to meet the condition. Since then, we have only shipped a part of their salt.

"Q. You have got $3.00 per ton, f. o. b. mine, for this salt?

"A. Yes. For what we shipped them. We shipped them refuse salt, but most of it was our surplus grades." (Tr. Vol. 9, p. 1715.)

It will be noted from the above testimony that Mr. Bayless, after testifying to the fact that refuse salt was not shown in the salt mining company's severance tax reports to the state, and had no commercial value, immediately contradicts himself and admits that refuse salt was shipped to the Gulf Refining Company at a price of $3 per ton, f. o. b. mine, during the period of trespass, but attempts to convey the impression that a part of this salt so shipped was so-called surplus grades of coarse salt. It is noted from a perusal of the various operating statements that there is no record kept of surplus grades, and we are forced to the conclusion that the entire amount of refuse salt sold to the Gulf Refining Company was obtained by the salt company from the alleged refuse salt, which was deducted in submitting severance tax reports to the state, on a percentage basis of 16.7 per cent. of the salt severed and hoisted to the mouth of the mine.

This court finds that this contract with the Gulf Refining Company establishes a value of $3 per ton for all alleged refuse salt severed and hoisted to the mouth of the mine during the period of trespass in 1929, 1930, and 1931.

Cotrespassers are bound in solido for damages occasioned by the trespass. Wallace v. Miller & Schnatman, 15 La. Ann. 449; Irwin v. Scribner, 15 La. Ann. 583; Johnson v. Legeai, 147 La. 92, 84 So. 505; Civ. Code, art. 2324.

All the participants in a tort may be joined in one suit. Williams' Heirs v. Zengel, 117 La. 599, 42 So. 153.

The following judgment was rendered by the trial judge:

"For these reasons, let there be judgment in favor of the State of Louisiana, and against the Jefferson Island Salt Mining Co. Inc. ordering, adjudging and decreeing:

"First, that Lake Peigneur was a navigable body of water at the time of the admission of the State into the Union.

"Second, that being a navigable body of water at that time, the State of Louisiana is hereby decreed, by virtue of its inherent sovereignty, to be the owner of the bed of the Lake to the ordinary highwater mark as of the date of its admission into the Union.

"Third, that the mean high-water mark of Lake Peigneur is hereby decreed to be the three-foot contour line above mean gulf level.

"Fourth, that because of the trespass committed by the defendant company on the property decreed to be owned by the State, that plaintiff is accordingly entitled to recover damages in the sum of Six thousand one hundred and ninety three dollars and forty eight cents ($6,193.48).

"Fifth, that interveners, J. Lyle Bayless and Lawrence Jones, are decreed to be jointly and in solido liable with the defendant, Jefferson Island Salt Mining Co., Inc., for the damages caused by the trespass.

"All costs of this proceeding to be borne by the defendant company and interveners." (Tr. Vol. 1, pp. 125, 126.)

For the reasons assigned, it is ordered that above judgment be amended so as to read as follows:

Third, that the mean high-water mark of Lake Peigneur is hereby decreed to be the 6-foot contour line above mean gulf level; and

Fourth, that because of the willful trespass committed by the defendant company on the property decreed to be owned by the state, that plaintiff is accordingly entitled to recover damages in the sum of $1,165,419.54 with legal interest from judicial demand, which said sum is arrived at by applying the value of $6 per ton to 177,616.4 tons of salt removed, from which is deducted 4 cents per ton severance tax heretofore paid by the defendant on this said 177,616.4 tons, and adding thereto the sum arrived at by applying the value of $3 per ton to 35,608.6 tons of alleged refuse salt removed, on which no severance tax has been heretofore paid.

It is now ordered that the judgment, as amended, be affirmed, and that defendant and interveners pay the costs of both courts.

O'NIELL, C. J., is of the opinion that the judgment of the district court is correct.

ROGERS, J., dissents, being of opinion that the judgment appealed from is correct.

ODOM, J., dissents.